Steven C. BRADY, d/b/a Creations Unlimited, and Terry T. Brady, d/b/a Alaska Husky Wood, Appellants,

v.

STATE of Alaska, Tomas Boutin, and James Stanley (Jim) Peterson, Appellees.

No. S–7916.

Supreme Court of Alaska.

Oct. 9, 1998.

Steven C. Brady, pro se, and Terry T. Brady, pro se, Anchorage.

Kevin M. Saxby, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellees.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

COMPTON, Justice.

I. *INTRODUCTION*

A beetle epidemic is decimating forests in Alaska. Steven Brady and Terry Brady generally oppose the State of Alaska's policy response to the epidemic. They particularly decry the State's treatment of them in denying their application to buy the right to har-

vest dead and dying trees near Moose Pass. They had hoped to show that such harvesting can help stanch the epidemic. The Bradys brought a broad array of claims against the State and two State forestry officials.[1] They appeal two summary judgments dismissing all claims in their consolidated suits. We affirm.

## II. FACTS AND PROCEEDINGS

### A. The Negotiations and Forest Land–Use Plan

A northern spruce bark beetle epidemic is killing vast numbers of trees in southcentral Alaska. In 1992 the State formed a Forest Health Initiative, directed by Daniel Golden, to address the problem. In April 1993 Golden suggested to Terry Brady that he apply to the Department of Natural Resources (DNR), Division of Forestry (Forestry), for a negotiated timber sale—i.e., a sale without public advertisement of or competitive bidding for the right to harvest a limited amount of timber.[2] Terry could then conduct a model timber-salvage project to demonstrate his belief that harvesting and reforestation can fight the epidemic.

In May 1993 Terry twice unsuccessfully applied for a sale in a 200–acre area near Moose Pass. Kenai–Kodiak Area Forester Jim Peterson rejected his applications. Peterson noted that a forestry regulation barred a sale until DNR's Division of Lands (DOL) had classified the land.[3] He also noted Forestry's policy of not making negotiated timber sales in areas of competitive interest in timber. Terry offered to help DNR prepare a site-specific Forest Land–Use Plan (FLUP) for the area by gathering data "for the 200 acres." (In addition to the regulation

that Peterson had noted requiring classification, the timber-sale statute bars sales of more than ten acres of timber before such an FLUP is in effect.[4])

The Bradys and other timber-sale applicants met with State Forester Tom Boutin on June 30, 1993. He agreed to "entertain" six applications for negotiated sales. Terry again offered to gather data for an FLUP. The State accepted this offer in a July 21 letter from Peterson:

> We would like to take you up on your offer to help prepare the site-specific plan as required [by] AS 38.05.112. You indicated your willingness to do the research, compile and report the required data[,] and submit this information to us. Due to our present workload, this assistance would help expedite the sale.

Terry began collecting data, and submitted two draft FLUPs in September.

The July 21 letter also acknowledged the Bradys' renewed application for a sale and requested $3,000 "as a presale deposit." Peterson wrote that Forestry was working with DOL and hoped to finish classifying the area "expeditiously." "In the meantime," he concluded, "we will begin preparation of a sale in the area requested upon receipt of the presale deposit. We look forward to working with you on successful completion of this proposal." Terry sent the $3,000, deeming it a "down payment."

On October 4 the public met to discuss forest issues in Moose Pass; Peterson and State Forester Boutin attended. At the meeting, Sherman (Red) Smith, another negotiated-sale applicant and a close business associate of Terry Brady, said, "As far as

---

1. The Bradys litigated most of the superior court proceedings, and all of this appeal, *pro se*. Their thorough briefs and admirable performance at oral argument leave no doubt that they bring their claims with diligence, zeal, and intelligence, and a sincere belief that the State has wronged them individually, and its citizens generally. Unfortunately, though, they have translated their complaints into a broad array of common-law, equitable, statutory, and constitutional claims. Some have arguable merit, and the Bradys make many good isolated points, while others are plainly without merit. Because of the way in which the Bradys have presented the case, our opinion is long, though most of the issues are not

close. We write at length in order to fairly develop, before ultimately rejecting, the arguably meritorious claims that the Bradys have identified, yet were unable themselves to develop fully, and in order to explain why some of their other claims fundamentally misconstrue various doctrines.

2. See AS 38.05.115.

3. See 11 AAC 55.040.

4. See AS 38.05.112(a).

we're concerned he's [Boutin's] made a contract with us." Boutin did not reply; he has affied that he did not hear the comment. On October 7 DNR Commissioner Harry Noah told the Bradys that DNR "might ... reject[ ]" the proposed sales as not being in the State's best interest.

A week later Peterson toured the proposed sale area with the Bradys and other applicants and said that Forestry had sent DOL "a copy of the Forest Land Use Plan. It's the best site-specific [data] that we have." Peterson also said, in response to a question about timing: "We can be prepared to sign ... make that contract ... sign that contract ... on the day they [DOL] sign the classification order."

On October 20 Terry submitted his final report and an invoice for professional services for $26,250. Peterson declined to pay, writing that, "[i]n all our discussions with you, never at any time was there an indication of our entering into a professional-services contract with you."

The parties agree that DOL used Terry's work in preparing a draft FLUP in October. The State deems the use "paraphrasing" that appeared only in a draft, not the final plan; the DOL employee who wrote the plans affied "that no time or money savings resulted [from the use]." Terry disputes this claim.

On November 12 Peterson wrote Terry Brady that "[a]fter considerable review, [Boutin] has decided that ... negotiated timber sales in the Moose Pass area would not be in the best interest of the state." Peterson gave two reasons. One was that there was "competitive interest" in the Moose Pass timber. The other was that the Bradys and their associates had applied for four contiguous sales, each of the maximum size for a negotiated sale. To grant their applications would effectively "circumvent[ ] the mandated public processes"—i.e., public notice and competitive bidding—for large timber sales.

The Bradys exhaustively pursued administrative appeals. They each then filed similar suits.

## B. *The Litigation*

The Bradys made three sets of claims: (1) constitutional, statutory, and tort claims assailing the State's forest management policy in general; (2) takings claims based on the State's dealings with them; and (3) common-law and equitable claims based on those dealings. Terry moved "for expedited consideration" of his demand for injunctive relief as to the State's forest policies; the court treated this as a motion for a preliminary injunction. The State cross-moved for summary judgment on all claims but estoppel. Brady complained that the common-law and equitable issues were unripe for adjudication, for want of discovery, and only briefly addressed them in opposing the cross-motion. The court accepted the State's detailed proposed findings of fact and conclusions of law verbatim in November 1994, granting it partial summary judgment on all claims but estoppel.

■ Terry amended his complaint to add Peterson and Boutin as defendants in their individual capacities. He expanded his remaining common-law claim(s). He also added a constitutional claim that the State and the officials (collectively the State) had retaliated against him for having sued. (We recount the facts and history of this claim in part III.E below.) The court granted defendants summary judgment on the remaining claims in October 1996. Its March 1997 final judgment awarded the State attorney's fees and identified its November 1994 findings of fact and conclusions of law as the basis for both partial summary judgments. The Bradys appeal the summary judgments. (They also contest the attorney's fee award but, as we explain in the margin, have waived the issue by failing to develop it.[5])

5. After the court issued its final judgment, the Bradys opposed its award of attorney's fees, apparently claiming to be public-interest litigants. The court affirmed the award. The Bradys did not make attorney's fees one of their forty points on appeal. Their briefs cursorily challenge the award, but their only argument as to why the

court abused its discretion is that they had "standing, cause[,] and responsibility" to sue. This is far from adequate. *See, e.g., Petersen v. Mutual Life Ins. Co.,* 803 P.2d 406, 411 n. 8 (Alaska 1990) (finding claim waived where appellant mentioned it in brief but "advanced [no] legal argument as to why the court erred.").

## III. DISCUSSION

### A. Standard of Review

 We review summary judgments *de novo*, drawing all reasonable inferences in the nonmovants' favor and viewing all facts in the light most favoring them.[6] We determine whether the parties genuinely dispute any facts; whether, if so, those facts are material to a viable legal theory; and, if not, whether the undisputed facts entitle the movant to judgment as a matter of law.[7] Any dispute must not only be genuine and material, but arise from admissible evidence, such as affidavits recounting personal knowledge of specific facts.[8]

### B. The Bradys Have No Viable Common–Law or Equitable Claims Arising from the Moose Pass Negotiations.

We have divided the Bradys' nonconstitutional claims about the Moose Pass transaction into two groups: those arising from the State's ultimate decision not to sell them the timber, *see infra* Part III.B.1; and those arising from its alleged inducement of, and ultimate refusal to pay for, Terry's professional services, *see infra* Part III.B.2.

#### 1. The Bradys cannot prove that the State breached any legally enforceable promise regarding the timber.

The Bradys argue that "an enforceable contract to sell [timber] was formed" because "an agreement, . . . subject only to a site-specific plan and land classification, and final agreement to price, had been reached." State officials manifested this agreement by comments, omissions, and acts between the June promise to entertain applications and the November decision to deny them. The Bradys also argue that, even if we cannot enforce this promise as a contract, we can do so via promissory estoppel. Their version of the facts suggests *two* arguable promises—a promise to sell timber, and a promise to negotiate in good faith to reach an agreement to sell timber. We consider each promise in turn, in terms both of contract and promissory estoppel.

##### a. The State made no promise to sell timber.

Our opinion last year in *Davis v. Dykman*[9] guides our review of this alleged promise. To show a contract, the Bradys must point to evidence that, when viewed in a light most favorable to them, shows that the State unequivocally accepted an offer by words and actions that objectively manifested an intent to be bound.[10] Unless some evidence could support such a finding, we will not disturb the summary judgment.

 Had the parties formed a contract making classification of the land a condition precedent to their duties, or having an open price term, it would likely be enforceable.[11] This we need not decide. When the State promised to "entertain" applications (i.e., offers), it promised at most to negotiate—to prepare for a sale subject to its ultimate determination that a sale was in its best interest. The State never objectively manifested an intent to be bound before it made that determination.

---

Despite our solicitude for *pro se* appellants, we must hold that the Bradys have waived this issue by failing to develop it.

**6.** *See, e.g., Sever v. Alaska Pulp Corp.*, 931 P.2d 354, 357 n. 2 (Alaska 1996).

**7.** *See generally, e.g., Maddox v. River & Sea Marine, Inc.*, 925 P.2d 1033, 1035 (Alaska 1996).

**8.** *See* Alaska R. Civ. P. 56(e) *and, e.g., West v. City of St. Paul*, 936 P.2d 136, 140 (Alaska 1997); *Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1215 (Alaska 1991).

**9.** 938 P.2d 1002 (Alaska 1997).

**10.** *See id.* at 1006; *State v. Johnson*, 779 P.2d 778, 780 (Alaska 1989) (citing *Howarth v. First Nat'l Bank of Anchorage*, 596 P.2d 1164, 1167 (Alaska 1979)).

**11.** Contrary to the State's suggestion, the lack of a price term is not fatal. The alleged contract is for a sale of goods. *See* AS 45.02.107(b) ("A contract for the sale . . . of timber to be cut is a contract for the sale of goods within this chapter. . . ."). Courts can enforce sale-of-goods contracts with open price terms if the parties so intended. *See Davis*, 938 P.2d at 1008 n. 6 (citing AS 45.02.305).

■ *Davis* makes clear that a court can never enforce an agreement to negotiate so as to bind one party to the ultimate agreement that the parties sought, but failed, to negotiate. In affirming a summary judgment that two parties had not formed a contract, we held that, while one party's letter "[could] be construed as an offer to negotiate," and while the other's acceptance may have formed "an agreement to negotiate," a court cannot enforce such an agreement by drafting, and then imposing on one party, the ultimate agreement that the parties failed to reach.[12] Boutin's "offer" to entertain applications, and the Bradys' submission thereof, may have formed an agreement to negotiate, but the State "necessarily," like the defendant in *Davis*, "retained the ability to say 'no.' "[13] The question thus becomes whether jurors could reasonably infer that the State in fact said "yes" to a timber-sale contract. We conclude that they could not.

State Forester Boutin agreed to "entertain" applications for a negotiated timber sale. The governing statute, AS 38.05.115, suggests that DNR may not make such sales until the commissioner finds that doing so is in the State's best interest.[14] The Bradys do not claim that Commissioner Noah ever found the sales to be in the State's best interest and accepted their offer. They argue instead that his subordinates, Peterson and Boutin, did so. They formed a binding oral contract, the Bradys argue, in which classification was only a condition precedent to any duty to perform, and in which setting a price and putting the contract in writing were but details. We do not agree. Peterson's and Boutin's various comments and si-

lences cannot, as a matter of law, manifest unequivocal acceptance of the Bradys' offer. (This conclusion makes it unnecessary to address the ill-briefed issue of whether the commissioner had in fact delegated to either of them the authority to bind the State to timber-sale contracts.)

■ We first consider Boutin's failure to respond to Red Smith's comments at the October 4 public meeting. The Bradys misconceive the offer/acceptance framework in arguing that Boutin accepted their offer by his silence. Smith's comment that "[Boutin]'s made a contract with us" was not an offer by Smith, let alone by the Bradys—their offers were their applications. Boutin cannot by his silence have "accepted" this "offer"; the rule that the Bradys themselves cite says that silence

> can operate as an acceptance in the following cases and no others: ... (b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence ..., and the offeree in remaining silent ... intends to accept the offer.[15]

Smith was not making an offer, but stating a belief that a contract already existed—i.e., that an offer and acceptance had already been made. He never indicated to Boutin that, by silence, he would manifest assent.[16]

■ The Bradys also stress Peterson's words, primarily his comment during an October 14 site tour of the proposed sale area that "[w]e can be prepared to sign ... make that contract ... sign that contract ... on

---

12. *See id.* at 1008.

13. *Id.* at 1009.

14. *See* AS 38.05.115(a) ("The [DNR] commissioner shall determine the timber ... to be sold, and the limitations, conditions, and terms of sale.... The commissioner may negotiate sales of timber ... without advertisement and on the limitations, conditions, and terms that are considered to be in the best interests of the state."). Terry described his application as "pursuant to AS 38.05.115."

15. Restatement of Contracts § 72 (1932) (re-restated, slightly revised, as Restatement (Second) of Contracts § 69 (1979)).

16. The Bradys argue that "[i]f Boutin had disagreed ..., then he had a duty to respond, either then, *or as soon as he understood Smith's statements.*" (emphasis added). Smith made his comment on October 4. Peterson noted his impression that "[Smith] thinks he has a contract," and discussed the meeting the next day with another Forestry official, who "reemphasized that [Boutin] needs to address the negotiated [sale] issue soon." *Two days later,* Boutin's superior, Commissioner Noah, told the Bradys that DNR might reject their applications. While the Bradys' standard is not the law—at least, not contract law—the State seems in any case to have met it.

the day they [DOL] sign the classification order."

Those words, however, do not manifest unequivocal acceptance. Peterson did not promise to sign the contracts once the land was classified, nor did he say that a binding oral contract already existed and that the formality of memorialization would occur then (i.e., colloquially, "This is a done deal, and we'll put it in writing then."). Rather, "We can be prepared to sign ... make that contract ... sign that contract ... on the day they sign the classification order," is a comment about timing and capacity, not a promise. Steven Brady's own affidavit states that Peterson was speaking "in response to a question *on timing*" (emphasis added). Peterson's words simply were not, as a matter of law, promissory.

The Bradys, however, insist that a jury evaluate this and other exchanges with State officials. They and the State rely on affidavits disputing the tenor and import of various conversations. At least two of our precedents, not cited by the Bradys, do suggest that *courts must be generous* at the summary-judgment stage to a party alleging a contract whose existence turns on a conversation that the parties recall differently. But one of those precedents involved a tribunal's total failure to consider evidence of nonwritten communication.[17] Another involved a

summary judgment that two parties had not formed a contract based on a writing whose facial ambivalence made it necessary to consider extrinsic evidence; i.e., conflicting recollections of what was said at a dinner meeting.[18] Here, we have considered all alleged communicative acts, written or not, and find no ambivalence: no reasonable juror could find that the comments, silences, or conduct, viewed in the light most favoring the Bradys, objectively manifested a present intent to be bound to sell timber.

The Bradys also claim that, even if there is no valid contract, they foreseeably relied on the State's "promise" to sell timber, and so we should estop the State to deny that promise. The original point of promissory estoppel was to enable courts to enforce contract-like promises made unenforceable by technical defects or defenses.[19] We have thus long held that one requirement for a promissory estoppel is that "an actual promise was made." [20] We need not list the other requirements, for promissory estoppel cannot, any more than contract, help the Bradys prove a promise to sell timber. The crux of their contract claim is that Peterson or Boutin at some point accepted their offer by *promising* that the State would sell them timber (and that, once DOL had classified the land, the State would sign a written timber-sale contract). The promise to sell

---

**17.** *See Childs v. Kalgin Island Lodge*, 779 P.2d 310, 314 (Alaska 1989).

**18.** *See Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1281–82 & n. 1 (Alaska 1985).

**19.** *See generally, e.g.*, Eric Mills Holmes, *Restatement of Promissory Estoppel*, 32 Willamette L.Rev. 263, 271–86 (1996).

**20.** *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1142 (Alaska 1996) (requiring "that an actual promise was made and itself induced the action or forbearance in reliance thereon"); *see also Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 103 (Alaska 1992) (requiring "actual promise" and affirming summary judgment because "[w]e are not persuaded that even with the factual inferences favoring Eufemio, the [defendant]'s language indicates a promise").

We have used Professor Corbin's test for promissory estoppel, which includes the "actual promise" requirement, in several cases besides *Reeves* and *Eufemio* since *State v. First National Bank of*

*Ketchikan*, 629 P.2d 78, 81 (Alaska 1981) (quoting 1A Arthur Corbin, *Corbin on Contracts* § 200, at 215–21 (1963)). *See James v. State*, 815 P.2d 352, 356 (Alaska 1991); *Crook v. Mortenson–Neal*, 727 P.2d 297, 300–01 (Alaska 1986); *Zeman*, 699 P.2d at 1284; *Alaska Bussell Elec. Co. v. Vern Hickel Constr. Co.*, 688 P.2d 576, 579 (Alaska 1984); *Glover v. Sager*, 667 P.2d 1198, 1202 (Alaska 1983). We are aware that many jurisdictions, perhaps a majority, have relaxed or abandoned the traditional rule that promissory estoppel requires a promise sufficiently definite and certain to constitute an offer or acceptance under contract law. *See* Holmes, *supra* note 19, at 286–90 & n. 58. Without briefing on this widely disputed issue, however, we are not prepared to alter our long-standing rule. We note, moreover, that to find the Bradys' claim viable would require us not merely to relax but to abandon the actual-promise requirement, for we conclude as a matter of law not merely that Peterson's words convey a promise too indefinite or uncertain to be an "acceptance" in contract terms, but that his words simply were not promissory.

timber that would be the "acceptance" required for a contract is thus analytically identical to the "promise" to sell timber required for a promissory estoppel. But the State, as we explained above, never made such a promise.

### b. No disputed facts are material to whether the State broke its promise to negotiate in good faith.

▮▮▮▮▮ The Bradys' briefs suggest two arguments: to wit, that the State promised not only *to sell timber,* but *to negotiate in good faith* to reach an agreement to sell timber. The State argues that, while it did make the latter promise, it did not break it. The Bradys' claim is somewhat like that of a disappointed bidder on a public contract who aims to recover bid-preparation costs, under the rule of *King v. Alaska State Housing*

*Authority,*[21] by proving that the State breached its implied promise to consider bids fairly and in good faith. The Bradys do not cite *King,* and their claim falls outside its rationale for reasons discussed in the margin.[22] Its rule, however, is relevant background to the question of whether the Bradys may base a claim on an alleged breach of the State's promise to entertain applications in good faith.

Many courts enforce promises to negotiate in good faith,[23] although there is no clear majority rule.[24] Most courts that do so limit relief to reliance damages: i.e., expenses incurred in negotiating, drafting, or preparing to perform a contract scuttled by another's bad-faith negotiating conduct.[25] Most deny expectation damages: i.e., expected profits on the hoped-for contract.[26] We held in

---

**21.** 633 P.2d 256, 261–63 (Alaska 1981).

**22.** If the State solicits bids for a public contract, it impliedly promises to consider them fairly and in good faith, and is liable for bid-preparation costs if it rejects them arbitrarily and capriciously. *See id.* at 263 & n. 7, *and, e.g., Dick Fischer Dev. No. 2 v. State, Dep't of Admin.,* 838 P.2d 263, 266 (Alaska 1992) (clarifying that liability turns. on whether officials acted in bad faith; had a reasonable basis for their decision; had broad or narrow discretion; and broke any laws). We have extended *King* from the disappointed-losing-bidder fact pattern to a case—like this one, at first glance—where the State solicited bids but then canceled the project. *See Dick Fischer,* 838 P.2d at 266 n. 5.

But *King* does not apply here; it applies if the State indicates that it will award a contract and solicits bids, inducing firms to invest resources in preparing bids in reasonable reliance on the State's implied promises to carry out the project and to give the contract to whoever's bid is best. *See King,* 633 P.2d at 261–62 (adopting *Heyer Prods. Co. v. United States,* 135 Ct.Cl. 63, 140 F.Supp. 409, 412–13 (Ct.Cl.1956)). DNR did not do that here; it only promised to *consider* making negotiated sales, and to entertain six applications to be purchasers *if* DNR decided that to make sales at all would best serve the public interest. The Bradys' investment of time and effort is thus unlike bidders' invited reliance on the State's clear decision to carry out a project in *King* and *Dick Fischer.*

**23.** *See, e.g., Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 96 F.3d 275, 277–78 (7th Cir.1996) (Posner, C.J.) (finding "a binding agreement to negotiate in good faith toward the formation of a contract of sale") *and, generally,* E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotia-*

*tions,* 87 Colum. L.Rev. 217, 263–69 (1987); *id.* at 266 nn.205–07 (collecting cases).

**24.** *Compare, e.g., Prenger v. Baumhoer,* 939 S.W.2d 23, 26–28 (Mo.App.1997) (discussing promissory-estoppel claim for expenses in reliance on promise to negotiate, reviewing split in caselaw, and rejecting theory) *with, e.g., Neiss v. Ehlers,* 135 Or.App. 218, 899 P.2d 700, 703–07 (Or.App.1995) (same, but concluding that "better reasoning supports the conclusion that promissory estoppel can apply . . . to promises that are indefinite or incomplete, including agreements to agree"). Some courts address such claims under a contract rather than a promissory-estoppel theory. *See, e.g., Venture Assocs.,* 96 F.3d at 277–78; *cf. King,* 633 P.2d at 263 & n. 6 (treating claim for bid-preparation costs under implied-contract theory, and doubting validity of promissory-estoppel theory).

**25.** *See, e.g., Goodstein Constr. Corp. v. City of N.Y.,* 145 Misc.2d 870, 548 N.Y.S.2d 393, 397–99 (N.Y.Sup.1989) (dismissing claim for expectation damages but not for reliance damages) (citing cases from four jurisdictions), *aff'd* 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356, 1359 & n. 2 (N.Y.1992); *see generally,* Farnsworth, *Precontractual Liability, supra* note 23, at 267 ("'[T]he appropriate remedy is not damages for the injured party's lost expectation under the prospective ultimate agreement but damages caused by [its] reliance on the agreement to negotiate."); *cf. King,* 633 P.2d at 263 & n. 8 (limiting damages to bid-preparation costs, and excluding lost profits on contract).

**26.** *See, e.g., Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73–74 & n. 2 (2d Cir.1989) (reversing dismissal of promissory-estoppel claim

*Davis* that a court may not enforce a failed agreement to negotiate by awarding what were essentially expectation damages, but did not address the availability of reliance damages.[27] Our *King* rule could support by analogy a more general cause of action, limited to reliance damages, for breach of a promise to negotiate in good faith.

We need not decide today, however, whether to allow reliance-damage claims based on promises to negotiate in good faith. Even if we did, we would hold as a matter of law that the Bradys cannot recover. They raise no genuine dispute of fact material to the simplest requirement of such a claim: that the State *broke* its promise to entertain applications in good faith.

■■■■■ The Bradys charge defendants with many wrongs, but only one concerns the promise to entertain their applications in good faith. They claim that the State's asserted policy reasons for declining to make negotiated sales, *see supra* at page 7, are pretexts. The *real* reason, they suggest, was fear of political controversy, environmentalist lawsuits, and DNR staff dissension. They offer evidence that the State's asserted reasons lack a factual basis, and that, unlike the political concerns, officials never mentioned them until the rejection letter. (As we explain in the margin, the Bradys also make a highly misguided argument that the rejection letter made tortious misrepresentations.[28])

■■■■■ Even assuming on summary judgment that all those factual claims are true, though, it is simply not bad faith for executive-branch officials who have never promised to pursue a given project, expressly or implicitly, to decide not to do so because of political controversy, litigation, and/or staff dissension. Quite to the contrary, that is part of their job. Executive officials must balance competing interests and calculate costs both political and fiscal (e.g., the costs of a lawsuit). One side of a policy conflict will lose each skirmish, and may see a project rejected for reasons beyond its technical merits. That does not mean that officials acted in bad faith; the State does not, once it takes a proposal under consideration, assume a duty thenceforth to ignore all factors beyond the proposal's narrow technical merits.

It is instructive to compare two leading cases, one from New York and one from Colorado, holding that agencies may have actionably breached promises to negotiate in good faith to sell public property.[29] In both, urban renewal authorities agreed in writing to negotiate with developers, giving them exclusive rights for fixed periods to work up bids to buy and redevelop public properties.[30] The authorities ended negotiations, the developers sued, and courts ultimately found their claims viable[31] (expressly limited, in one case, to reliance damages[32]). In the New York case, *Goodstein Construction Co. v. City of New York,* Goodstein claimed that

based on promise to negotiate in good faith, strongly suggesting that trial court on remand limit damages to out-of-pocket costs); *but compare Venture Assocs.,* 96 F.3d at 278–79 (Posner, C.J.) (holding expectation damages available in principle, but usually unprovable); *with id.* at 280–81 (Cudahy, J., concurring) (arguing only reliance damages available in principle).

27. *See Davis,* 938 P.2d at 1006–08 (affirming superior court's refusal to enforce failed agreement to negotiate settlement by crafting settlement agreement and imposing it on one party).

28. The Bradys argue that the letter tortiously "misrepresented" the facts because, for example, there was in fact no "competitive interest" in the timber. This argument misconstrues the nature of tort law; a misrepresentation is only actionable if it causes harm. *See, e.g., Barber v. National Bank of Alaska,* 815 P.2d 857, 862 (Alaska 1991) (requiring proof of damages resulting from reliance on misrepresentation). The State's deci-

sion to reject the Bradys' applications harmed them—and if made in bad faith, could possibly have been actionable—but its act of *stating its reasons for rejecting their applications* did not harm them. Any dispute, however genuine, about the basis or sincerity of those reasons is simply immaterial to a tort claim.

29. *See Goodstein Constr. Corp. v. City of N.Y.,* 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356 (N.Y.1992); *Vigoda v. Denver Urban Renewal Auth.,* 646 P.2d 900 (Colo.1982).

30. *See Goodstein,* 590 N.Y.S.2d 425, 604 N.E.2d at 1357–58; *Vigoda,* 646 P.2d at 902–03.

31. *See Goodstein,* 590 N.Y.S.2d 425, 604 N.E.2d at 1359 & n. 2; *Vigoda,* 646 P.2d at 904–05.

32. *See Goodstein,* 590 N.Y.S.2d 425, 604 N.E.2d at 1359 & n. 2. (The *Vigoda* court merely reversed a dismissal without addressing the issue of damages. *See* 646 P.2d at 905.)

the City had negotiated with another firm while expressly bound to negotiate only with Goodstein.[33] In the Colorado case, *Vigoda v. Denver Urban Renewal Authority,* the Authority claimed an "impasse" in negotiations, but there was a genuine dispute as to whether it had in fact *refused* to negotiate further to retaliate for Vigoda's critical comments to the press.[34]

The Bradys can allege no broken promise about a specific process of negotiation, for the State made none. Nor do they allege that the State ended negotiations for an affirmatively improper reason like retaliating for constitutionally protected activity. We thus need not decide in this case whether to ever allow a claim for costs incurred in reliance on a promise to negotiate in good faith. Any such claim would surely require, at least in the governmental context, more than an allegation that the decision to end negotiations was so misguided, and the stated reasons so implausible, that it must have been in bad faith. (A broader theory might well run up against discretionary-function immunity; officials responsible for allocating scarce resources have broad discretion to choose specific projects.[35]) Breach of some specific promise about the negotiation process, for example, or evidence of an affirmatively wrongful motive—like corruption, extortion, or, perhaps, retaliation for unrelated activity—could suffice. While a genuine factual dispute about the basis or sincerity of the asserted reasons for ending negotiations would be material if there were evidence of some improper "real" reason, it cannot suffice alone. And as we noted above, though

the Bradys feel understandably frustrated by the "real" reasons that they suspect for DNR's decision, those reasons are not improper.

2. *Terry Brady cannot prove that the State contracted to pay him to research an FLUP, will be unjustly enriched if it does not pay him, or fraudulently induced him to complete the work.*

Terry claims that the State owes him $26,250 on a contract or *quantum meruit* theory for his professional services in researching an FLUP. He also suggests that Peterson tortiously misrepresented the State's intent in order to induce him to complete the work. The State does not dispute that Terry offered to do the disputed work, and that it accepted his offer.

a. *There was no contract.*

■ There was no written contract for Terry's work, and he said in an administrative appeal, "I admit there was no agreement as to compensation." There was thus no enforceable contract for want of an essential term—price.[36] (This alone would suffice to bar enforcement, but we also note that, as the State pointed out to Terry, it can only make professional services contracts in writing and after bidding and formal approval.[37])

b. *The State was not unjustly enriched.*

■ To gain restitution of the value of his services in *quantum meruit,* Terry need not show an actual promise or agreement,[38]

33. *See Goodstein,* 145 Misc.2d 870, 548 N.Y.S.2d 393, 399 (N.Y.Sup.1989), *aff'd,* 590 N.Y.S.2d 425, 604 N.E.2d at 1359.

34. *See Vigoda,* 646 P.2d at 904.

35. *See* AS 09.50.250 (preserving State's sovereign immunity from suits arising from performance of discretionary functions); AS 09.65.070(d)(2) (giving municipalities same immunity); *see, e.g., Integrated Resources Equity Corp. v. Fairbanks N. Star Borough,* 799 P.2d 295, 301 (Alaska 1990) (applying AS 09.65.070(d)(2) to choice of broker to invest Borough funds).

36. *See Davis,* 938 P.2d at 1006–07. The alleged timber-sale contract could include an open price term under the UCC, *see supra* note 11, but

professional services do not come within the UCC.

37. *See* AS 36.30.100–.270.

38. *See, e.g., White v. Alaska Ins. Guar. Ass'n,* 592 P.2d 367, 371 (Alaska 1979) (describing quasi-contract as legal fiction " 'based on the maxim that one who is unjustly enriched at the expense of another is required to make restitution,' " and noting that "an agreement between the parties is not ... necessary.") (quoting *Hill v. Waxberg,* 237 F.2d 936, 939 (9th Cir.1956)).

We refer to Terry's cause of action as *quantum meruit.* "Courts generally treat actions brought upon theories of unjust enrichment, quasi-contract, contracts implied in law, and *quantum*

but instead that: (1) he conferred a benefit on the State; (2) the State appreciated the benefit; and (3) the State accepted and retained it under circumstances making it inequitable to do so without paying him.[39] While the State disputes all three elements, we need address only the last, inequity, which is the most significant.[40]

▬ It is not unjust to retain a benefit given without expectation of payment.[41] We have noted in *dictum* that this is true in a business as well as a friendly context if " 'services were rendered simply in order to gain a business advantage.' "[42] That is the State's view: Brady offered to do the work; the State accepted; neither mentioned compensation; and he did the work in his self-interest, hoping to facilitate a contract.

▬ The Restatement of Restitution provides, and many non-Alaskan cases have held, that one who renders services in the expectation of gaining a future business advantage ordinarily cannot recover the value of those services in *quantum meruit*, even if her expectation goes unrealized.[43] We adopt that rule. We note that it has two exceptions: a plaintiff may be entitled to restitution if she manifested an expectation that the recipient would pay for her services, or if she rendered services in reliance on the recipient's promise to enter a contract, or to negotiate in good faith to form one, and the recipient then broke that promise.[44] Thus, if the State had promised to execute a timber-sale contract, or breached its promise to negotiate in good faith, restoring to Terry the value of his services might be a viable theory. But the State, as we discuss in Part III.B.1 *supra*, did neither.

▬ An inquiry into whether a plaintiff manifested an expectation of payment has two aspects. It is objective—i.e., a court must ask whether a reasonable person in the recipient's position would have realized from the plaintiff's words and acts that she expected to be paid.[45] And it is equitable, as the 1983 draft Second Restatement stresses by asking whether, if the recipient retains the benefit of the services without paying, his conduct will appear "unconscionable in purpose or effect."[46] A comment to the 1983 draft makes a point relevant to both aspects

---

meruit as essentially the same." *Alaska Sales & Serv., Inc. v. Millet,* 735 P.2d 743, 746 n. 6 (Alaska 1987).

39. *See Millet,* 735 P.2d at 746.

40. *See id.* ("[T]he most significant requirement . . . is that the enrichment . . . be unjust; that is, the defendant must receive a true windfall or 'something for nothing.' ").

41. *See Sparks v. Gustafson,* 750 P.2d 338, 342–43 (Alaska 1988).

42. *Darling v. Standard Alaska Prod. Co.,* 818 P.2d 677, 680 n. 6 (Alaska 1991) (quoting *Bloomgarden v. Coyer,* 479 F.2d 201, 211 (D.C.Cir.1973)).

43. *See* Restatement of Restitution § 57 (1937) (providing that one who "manifest[s] that he does not expect compensation [for a benefit] is not entitled to restitution merely because his expectation that the other will . . . enter into a contract with him is not realized"); *and, e.g., Peko Oil USA v. Evans,* 800 S.W.2d 572, 576 (Tex.App.1990) (holding A not entitled to quasi-contract recovery for introducing B to business opportunity where A did so not in hopes of payment, but in hopes of gaining contract to market B's output resulting from new opportunity); *id.* at 577–78 ("[C]ourts considering the question have held that the expectation of a future business advantage or opportunity cannot

[support] a cause of action in *quantum meruit.*") (collecting cases); *Bloomgarden v. Coyer,* 479 F.2d 201, 211 & n. 60 (D.C.Cir.1973) (declining to mandate compensation where "services were rendered simply in order to gain a business advantage") (collecting cases).

44. In one case, Hill, a developer, asked Waxberg, a contractor, to help prepare a building project, promising to give Waxberg the contract if financing materialized. *See Hill v. Waxberg,* 237 F.2d 936, 938 (9th Cir.1956). Waxberg did the work, and the financing went through, but he and Hill could not agree on a contract, so Hill hired another contractor. The court awarded Waxberg restitution of the value of his work. *See id.* at 938–40; *but see* Farnsworth, *Precontractual Liability, supra* note 23, at 231–33 (discussing *Hill* approvingly but noting that, "[d]espite the appeal of restitution, it has been largely neglected as a basis of precontractual liability").

45. Restatement (Second) of Restitution § 6, cmt. a (Tentative Draft No. 1, 1983).

46. *Id.* § 6(2) (allowing restitution if defendant's "conduct in negotiating for a gain or advantage results in a benefit to him and a loss or expense to another . . . if, in the absence of compensation to the other, the conduct appears unconscionable in purpose or effect.").

of the inquiry: a party negotiating a contract usually realizes that she is venturing time and effort at the risk that negotiations may fail.[47] Thus, when a disappointed plaintiff seeks restitution of the value of services that she provided during negotiations, a court must decide whether, under all the circumstances, the recipient knew or should have known that the plaintiff expected to be paid, or whether, as is usually fair to say, the plaintiff should have known that she was taking a chance.

■ Terry never said, until he submitted his invoice, that he expected to be paid. He seemed to have volunteered to do the work in order to gain a business advantage by expediting the land classification. His brief does not discuss whether a reasonable entity in the State's position would have inferred that he expected to be paid. (He did argue below that the project's economic realities made that expectation apparent, but he has not argued this on appeal.) He identifies no genuine dispute of fact material to the issue of whether the State should have realized that he expected to be paid. Given his silence, and the reasonable alternate explanation for his efforts, officials had little or no reason to think that he did. There is no evidence to support a finding that their acts were unconscionable in purpose or effect.

c. *Neither the State nor Peterson is liable for fraudulently inducing Terry to finish a draft FLUP.*

■ Terry claims that Peterson at some point learned that the State had decided not to make negotiated sales, yet tortiously misrepresented its intentions in order to induce Terry to complete his work on an FLUP.

The crux of his claim is a comment that Peterson allegedly made in August to Larry Smith, one of the six negotiated-sale applicants. Peterson allegedly warned Smith not to tie up $3,000 in a presale deposit, because Peterson did not think that the State intended to make any sales. Terry claims that Peterson thus misrepresented the State's intent when he told the Bradys on October 14, "We can be prepared to ... sign that contract." (Terry may also have meant to sue the State for misrepresentation, but sovereign immunity bars such a claim.[48])

We need not decide whether Peterson made any misrepresentation, for Terry did not make adequate allegations· or point to evidence on a necessary element of a misrepresentation claim: to wit, what reliance Peterson intended to induce by, or how Terry justifiably relied to his detriment on, the October 14 "misrepresentation."[49] Terry had already submitted his two draft reports, and he submitted the final report six days later. Peterson said in the same October 14 conversation that he had already sent Terry's draft to DOL; we know that they had already used it. Terry does not specify what Peterson hoped to induce him to do, or what he (Terry) in fact did. His claim thus fails as a matter of law.

C. *The Bradys' Takings Claims Wholly Lack Merit.*

■ The Bradys argue that the State, Boutin, and Peterson have unconstitutionally taken three species of "property" from them without compensation: (1) Terry's work-product; (2) the Bradys' right "to see the negotiations [for a timber sale] through"; and (3) their "forest resource property

47. *See id.* cmt. b:
[W]hen the [defendant] cannot be charged with a violation of duty, and no agreement has been concluded between the parties, the fact that one of them has gained by the course of bargaining does not alone signify that he [has been] unjustly enriched.... [Negotiators] are often aware that burdensome effort and outlay on one side is placed at risk. If it induces the other party to contract with the venturer, he may reap a correspondingly large gain; if not, he must hope for success in another negotiating process. The assumption of risk is sometimes explicit, sometimes an aspect of the line

of business concerned (analogous to a usage of trade), and sometimes implicit in the arm's-length relation between the parties.

48. *See* AS 09.50.250(3). Sovereign immunity does not protect Peterson in his individual capacity. *See Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 162 n. 29 (Alaska 1987).

49. *See Barber*, 815 P.2d at 862 (noting that a claim for "knowing misrepresentation" requires, *inter alia*, "intention to induce reliance, justifiable reliance, and damages.") (citing Restatement (Second) of Torts § 525 (1976)).

rights, shared in common with all other [Alaska] citizens" under Article VIII of the Alaska Constitution. These claims are patently meritless—the latter two because they involve no constitutionally cognizable property, and the first because, although Terry's services constitute "property,"[50] the State did not unconstitutionally "take" them, since he voluntarily gave them.

### D. The State Is Not Liable in Negligence, or Subject to an Accounting, or to an Injunction under the Public Trust Doctrine or Forest Protection Statutes, for Its Management of Alaska's Forests.

The Bradys make long, articulate, impassioned, and voluminously supported arguments, based on their forestry expertise, assailing the State's forest policies. While we are not qualified to say how effective their arguments are as political critiques or professional forest policy proposals, we have little difficulty in finding that they lack merit as legal arguments.

The Bradys claim that the State's failure to stanch the beetle epidemic renders it liable in negligence, in equity as a trustee who has allowed waste of the trust corpus, and under forest-protection statutes; subject to an injunction in the nature of mandamus to obey those statutes and the Public Trust Doctrine; and subject to a judgment that it has violated the law by declining to enforce laws resulting from a 1982 ballot initiative and directing the State government to manage federal lands located within Alaska.[51]

We need not discuss the merits of most of these claims, for the State enjoys discretionary-function immunity under AS 09.50.250(1) for its setting of forest-management policy. While the doctrine of discretionary-function immunity requires us to draw a "sometimes vague and wavering line"[52] between acts of policymaking, for which the State is immune from suit in tort, and operational acts that implement policy, for which it is not immune, the broad failures that the Bradys attribute to the State fall well on the immune "planning" side of the line. Even if some aspects of the decisions were near the line, moreover, we note that "implementation of [a] policy is immune if the decisionmaker is authorized to consider basic political, social or economic policy factors and in fact considers them."[53]

The Bradys misconstrue the planning/operational distinction, arguing that "while particular ... procedures may be discretionary, the requirement to take actions pursuant to [AS 41.15 and 41.17] is strictly ministerial." The point of the distinction, however, is to immunize policy-level (or "discretionary") decisions about whether to undertake activities, but to leave the State subject to liability, once it decides to undertake an activity, for negligently performing particular operations to implement the broad policy decision.[54] The Bradys quote our recent statement that "when a statute, regulation, or policy specifically prescribes a course of conduct, the discretionary-function immunity [exception] does not apply."[55] This aids them not, for they identify no statutes, regulations, or policies prescribing *specific* courses of conduct that the State has neglected or violated. They cite all of the Forests and Forest Resources chapters of the Alaska Statutes.[56] They offer as standards only those chapters' declarations of "intent"—"to provide protection, commensurate with the value of the resources at risk, for ... natural resources"[57] and "to ensure that management of forest resources guarantees perpet-

---

50. See *DeLisio v. Alaska Superior Ct.*, 740 P.2d 437, 440–41 (Alaska 1987) (holding that professional services constitute "property" under Alaska Constitution).

51. See AS 38.05.500–.505.

52. *Freeman v. State*, 705 P.2d 918, 920 (Alaska 1985).

53. *Id.*

54. See, e.g., *State, Dep't of Transp. & Pub. Facils. v. Sanders*, 944 P.2d 453, 458–59 (Alaska 1997) (discussing cases).

55. *Id.* at 457.

56. See AS 41.15.010–.950, 41.17.010–.950.

57. AS 41.15.010.

ual supplies of renewable resources"[58]—and the sections of the Alaska Constitution that establish the policy of "encourag[ing] . . . the development of [State] resources by making them available for maximum use consistent with the public interest" and mandate application of the "sustained yield" principle.[59]

Planning how to translate those broad commands into policies, programs, and allocations of money and personnel is a quintessential "discretionary function." The prospect of having to apply the passages that the Bradys cite as tort standards reminds us of why we treat choices involving the assessment of competing priorities and allocation of scarce resources as discretionary functions.[60] The DNR commissioner and his or her subordinates have a duty to make those policy-level decisions, but the Bradys cannot sue the State in tort over the decisions they make. The proper remedies for unwise or unduly timid decisionmaking at that level are electoral, not judicial. We thus conclude that the State is immune from the Bradys' tort claims regarding its management of its forests and response to the beetle epidemic. (We do briefly comment in the margin, however, on two of those claims.[61])

Looking beyond the tort claims to which the State is immune, we note that the Bradys' request that we enjoin the State to follow the Constitution and forestry laws is meritless. The State is already obliged to do so. To that pre-existing duty, an injunction to follow the law would only add, at the

remedial level, the possibility of contempt sanctions. It would not provide a cause of action to circumvent discretionary-function immunity. Nor would it provide the workable legal standard to evaluate the State's performance whose absence is the reason for that immunity.

The Bradys offer no authority for their argument that, since the State holds public lands as a "trustee" under Alaska's Public Trust Doctrine, and since a private trustee can be subject to an accounting to the beneficiaries for allowing waste of the trust corpus, the State can thus by analogy be liable *in damages* under the Public Trust Doctrine for letting beetles destroy the arboreal corpus of the public trust. The Bradys point to no opinion applying the Public Trust Doctrine thus. Finally, they have waived, for failure to develop, any argument that the State has wronged them by finding unconstitutional, and so declining to enforce, two statutes adopted by a 1982 ballot initiative that direct the State to manage federal lands located within Alaska.[62]

E. *Terry Brady Has Not Adequately Argued That Officials' Post–Litigation Treatment of Him Violated Equal Protection, or Offered Admissible Evidence That It Comprised Unconstitutional Retaliation.*

1. *Facts and proceedings*

In April 1994, after the Bradys had filed

---

58. AS 41.17.010.

59. *See* Alaska Const. art. VIII, §§ 1, 4.

60. *See Industrial Indem. Co. v. State*, 669 P.2d 561, 565 (Alaska 1983); *see also Sanders*, 944 P.2d at 458–59 ("Because the governing regulation provides no standards that a court might use to analyze the . . . decision, [that] decision is protected by the discretionary function exception. . . .").

61. The Bradys misconstrue the doctrine of *res ipsa loquitur* in thinking the State's "exclusive control" of forests (including bark beetles) equivalent to exclusive control of a dangerous instrumentality under that doctrine. The superior court was right as a matter of law to note that the State is not in control of the bark beetle. *Cf. Carlson v. State*, 598 P.2d 969, 973 (Alaska 1979)

(noting "State's conceded lack of control over attacking bear" and approvingly noting that plaintiffs did not argue that State's "inherent possession or control" of wild animals made State liable in tort for attack). We find equally meritless the Bradys' theory that, because AS 41.15.020 directs the DNR commissioner to protect forests from destructive agents, the Department is negligent *per se* for failure to control the epidemic. That theory would, in effect, make the State strictly liable for all harm to its forests.

62. *See* 1983 Formal Op. Att'y Gen. 27 (evaluating AS 38.05.500–.505). The Bradys make policy arguments in favor of the law, and a political-science critique of the decision not to enforce it, but cite no *legal* authority for the propositions (1) that AS 38.05.500–.505 is in fact constitutional; or (2) that it is illegal for the State to find a law unconstitutional and not enforce it (until a court orders it to).

suit, Terry Brady [63] was perusing public documents in DNR offices when Boutin ordered him to "get the hell out of the forestry office." Boutin made that order pursuant to AS 09.25.122, which, inexplicably, limits access to otherwise public records by "person[s] involved in litigation" with the State, requiring them to use discovery procedures to obtain documents rather than simply reviewing and copying those that are already publicly available.[64]

Brady wrote Assistant Attorney General Kevin Saxby, who was handling the litigation for the State, about the incident and the scope of AS 09.25.122. Brady filed the letter with the court and, on June 9, 1994, asked it "to define the term 'litigant' and when it [applies to limit the right] to receive, view or otherwise use official state documents." He complained that officials were denying him access to all public forestry records, even if unrelated to his suit, which kept him from working as a forestry professional. The court did not address the request. In a June 13, 1994, letter about discovery scheduling, Saxby told Brady that he had advised Forestry to let Red Smith use public records without using formal discovery procedures, because Smith had promised not to use such records in the litigation. Saxby offered to advise Forestry similarly as to Brady if he too would commit in writing to "limit [his] records searches to purposes other than discovering evidence for use in [his] litigation." Brady apparently never responded to this offer.[65]

In July 1994 the DNR Public Information Center's director told Brady that "counsel" had told her that Brady "is in litigation with the state and [that] the public records statutes require him to use litigation discovery procedures." She denied him the usual open access to various public materials "that related, in one form or another, to DNR's management of the State's timber resources." In June 1995 Red Smith asked Brady to resign the presidency of a forest-products corporation that Smith chaired. Smith mentioned an "order of the Attorney General's office" whereby Brady was "considered, apparently for all intents and purposes, as a 'litigant,'" and which had "severely reduced" his "effectiveness as the president."

In September 1995, after the first partial summary judgment, Brady amended his complaint to add Boutin and Peterson as defendants, recount the above facts, and allege a "tortious . . . denial of constitutionally established inherent rights." In opposing the State's motion for summary judgment on the Bradys' remaining claims, Terry argued that there were genuine disputes of fact material to this claim. He appended an affidavit "concerning effects of alleged tortious conduct by defendants resulting in loss of potential income and professional status as result of filing suit against State of Alaska."

In June 1996, after learning that the court had mislaid his June 1994 request for a definition regarding AS 09.25.122, Brady filed a new motion asking the court to declare that the statute makes one a "party in litigation" who must use discovery to review public records only "to the extent that 'litigation' is narrowly defined."

Brady filed affidavits alleging retaliatory acts by State officials. His affidavit related the ban on access to public records and its effect on his livelihood. He also affied that he believed that officials had ordered State employees, and pressured forestry professionals, not to associate with him. Golden

---

**63.** These events and the legal claim to which they have given rise concern only Terry Brady, not Steven Brady, and so we refer to Terry simply as "Brady" throughout.

**64.** The litigation-disclosure provision, AS 09.25.122, reads in part:

A public record that is subject to disclosure and copying under [the *Public Records Act,*] AS 09.25.110–09.25.120 remains a public record subject to disclosure and copying even if the record is used for, included in, or relevant to litigation . . . involving a public agency, ex-

cept that with respect to a person involved in litigation, the records sought shall be disclosed in accordance with the rules of procedure applicable in a court. . . . In this section, "involved in litigation" means a party to litigation or representing a party to litigation, including obtaining public records for the party.

**65.** The record seems to contain no answer to Saxby's letter; Brady's opening brief alleges none; and his reply brief does not dispute the State's claim that he never responded.

affied that Boutin had asked him to convey to Brady a threat to protract the litigation. Smith affied that Saxby had threatened him with criminal prosecution if he gathered public records for Brady. Boutin and Saxby each denied the allegations in affidavits. Brady filed most of the above items in support of his declaratory-judgment motion, but did refer to many of them in opposing summary judgment as to his constitutional-tort claim.

In July 1996 the court denied Brady's declaratory-judgment motion, finding the proposed order "not helpful" and AS 09.25.122 "clear on its face." When the court granted the State's final partial-summary-judgment motion in October 1996, it thereby dismissed Terry's constitutional-tort claim. It made no relevant findings of fact or conclusions of law.[66]

### 2. Discussion

Brady's complaint about State officials' response to his lawsuit seems to incorporate two overlapping theories, each of which could be a constitutional-law claim. The first theory is that the broad application of AS 09.25.122 violated the Alaska Constitution's guarantee of "equal rights, opportunities, and protection under the law"[67] by denying Brady, because he was involved in litigation with the State, the same right of access as other citizens to public records unrelated to that litigation. The second theory is that, through an intentionally overbroad denial of access to records, and the other alleged acts noted above, State officials tortiously retaliated against Brady for exercising his constitutional right of access to the courts. We conclude that Brady has waived the first theory by failing adequately to develop it,

and that, even with all reasonable inferences drawn in his favor, the State is entitled to judgment as a matter of law on the second theory.

### a. Equal protection

■ An equal-protection challenge to AS 09.25.122 is not, at first blush, implausible. But Brady simply has not developed a legal argument elaborating that challenge. After his opening brief argued that Boutin and Saxby's "broad interpretation of the terms 'litigant' and 'litigation'" denied him "equality before the law," the State cogently replied that he did not claim to have been "treated differently from any other person." That rebuttal is not entirely correct. Brady's opening brief does contrast the defendants' broad application of AS 09.25.122 to him with our holding in a 1991 case involving a Supreme Court justice's contact with the governor regarding a lawsuit that involved the justice's private business interests.[68] Brady read our opinion to indicate that "contact with state officials (outside of pending litigation) was not ... improper," and concluded that the State was thus treating "private citizens involved in legal disputes with the State ... 'differently' than members of the judiciary."

In the judicial-conduct case, however, we held that the justice had sanctionably created an appearance of impropriety by meeting with the governor to ask him to intervene in ongoing litigation between the State and a corporation in which the justice had interests.[69] Brady does not specify any part of the opinion that defends judges' rights to consult with State officials on matters unrelated to pending litigation; the opinion certainly does not discuss the scope of the term

---

66. The court made no findings or conclusions at all in granting the second partial summary judgment. The court based its final judgment on the findings and conclusions that it had adopted in granting the *first* partial summary judgment in November 1994. Brady had not yet made a constitutional-tort claim, so those findings do not adjudicate that claim.

67. Alaska Const., art. I, § 1.

68. *See Inquiry Concerning a Judge,* 822 P.2d 1333 (Alaska 1991).

69. *See id.* at 1336–37, 1341–43 (holding that, where State-run corporation was to conduct public hearing to decide whether to accept agreement settling litigation between it and corporation in which judge was officer, director, and shareholder, judge created appearance of impropriety by privately meeting with governor to ask him to stop State corporation's director from postponing hearing).

"litigation" as it might be used to measure such a right. The opinion simply did not involve equal-protection analysis; indeed, it stressed that canons of judicial ethics "limit judges' activities in a fashion that is not required of other citizens."[70] Brady's opening brief offers no other support for an equal-protection claim, and his reply brief does not develop it. Despite our solicitude for *pro se* litigants, we must conclude that he has waived the claim by failing to brief it adequately.[71]

#### b. *Unconstitutional retaliation*

■ Brady also argues that officials tortiously retaliated against him for exercising his constitutional right of access to the courts. He thus seeks damages under 42 U.S.C. § 1983 for a violation under color of state law of his rights under the First and Fourteenth Amendments to the federal constitution. As we discuss in the margin, Boutin is the only defendant as to this claim.[72]

In challenging the summary judgment on this claim, Brady argues that Golden's and Boutin's conflicting affidavits regarding Boutin's alleged threat "create[d] an issue of material fact"; the State itself has acknowledged that Saxby's and Smith's affidavits create a genuine dispute about Saxby's alleged threat. The parties do not genuinely dispute any facts about the denial of access to public records—except its motive.

■ Brady's legal support comprises *Harrison v. Springdale Water & Sewer Commission*,[73] an arguably relevant federal circuit court opinion, albeit one whose facts greatly differ from those alleged here. The Harrisons sued the Commission over a sewer discharge onto their land; the Commission retaliated by conspiring to force them to sell their land by threatening to condemn it on a pretext.[74] The court noted that the right of access to the courts is " 'one aspect of the [First Amendment] right to petition [government for the redress of grievances].' "[75] It held that federal law—which governs Brady's § 1983 claim[76]—makes "clear that state officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future."[77] *Harrison* and other federal opinions indicate that retaliatory intent makes an official act unconstitutional even if the target does not succumb by ceasing his or her protected activity;[78] "even if the act, when taken for a different reason, would have been proper";[79] and even if the act is but a threat of retaliation that is not carried out.[80]

**70.** *Id.* at 1343 (discussing Alaska Code of Judicial Conduct).

**71.** *Cf. A.H. v. W.P.*, 896 P.2d 240, 243 (Alaska 1995) (treating as abandoned arguments that *pro se* appellant inadequately briefed and failed to support with citations to legal authority).

**72.** Brady has sued Boutin and Peterson individually, but has not alleged any retaliatory acts by Peterson; several of his allegations, meanwhile, involve Saxby, whom he has not sued individually. Only individual officials, and not the State, can be liable in damages under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Boutin is thus the only defendant potentially liable for unconstitutional retaliation.

**73.** 780 F.2d 1422 (8th Cir.1986).

**74.** *See id.* at 1424.

**75.** *Id.* at 1427 (quoting *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972)).

**76.** *See Van Sandt v. Brown*, 944 P.2d 449, 452 n. 5 (Alaska 1997) (noting that federal, not state, law governs § 1983 claim in state court) (citing *Howlett v. Rose*, 496 U.S. 356, 375–76, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990)).

**77.** *Harrison*, 780 F.2d at 1428 (collecting federal cases).

**78.** *Id.*

**79.** *Matzker v. Herr*, 748 F.2d 1142, 1150–51 (7th Cir.1984).

**80.** *See, e.g., Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir.1994) ("[A] threat of retaliation is sufficient injury [to support a First Amendment claim] if made in retaliation for an inmate's use of prison grievance procedures."); *Clark v. Township of Falls*, 890 F.2d 611, 622 (3rd Cir. 1989) (presuming that threat alone can support recovery); *Davis v. Village Park II Realty*, 578 F.2d 461, 464 (2d Cir.1978) (affirming award of damages for threat that was withdrawn); *Silver v. Cormier*, 529 F.2d 161, 162–63 (10th Cir.1976) (affirming award of damages for threat that was not carried out).

Brady has alleged four retaliatory acts. One is the intentionally overbroad application of the litigation-disclosure statute to harm his business and professional interests (or just to harass him). The second is Boutin's threat, via Golden, to protract any litigation. The third is Saxby's threat to prosecute Smith. The fourth is a set of acts: ordering State officials, and pressuring private forestry professionals, not to associate with Brady. Brady offered no admissible evidence to support that set of allegations, as we discuss in the margin,[81] so we disregard it.

The third alleged act, Saxby's threat, cannot support a claim for unconstitutional retaliation, for the simple reason that Saxby is not a defendant. Any threat that he made to Smith could only be evidence of a conspiracy to retaliate against Brady, which could support an inference that Boutin shared a retaliatory intent and acted thereon. Any genuine dispute about Saxby's exchange with Smith is thus too slightly and indirectly relevant to be "material" to Brady's § 1983 claim against Boutin.

The second alleged act is Boutin's comment that, as Golden paraphrased it, if Brady sued, "the [S]tate would protract the legal challenge to its fullest extent." Golden affied that he had "no question . . . that this was a threat to Mr. Brady to use the [State's] unlimited resources to bury Mr. Brady in the legal process and caus[e him] excessive . . . expense." In reviewing the summary judgment, we are bound to assume, despite Boutin's denial, that he did in fact say that the State would "protract the legal challenge to its fullest extent."

We are not bound, however, to conclude that Golden's interpretation of that comment, even though it appears in Golden's affidavit, is a reasonable inference that we must draw in Brady's favor. The most natural reading of Boutin's comment is that, if Brady sued, the State would defend its interests fully, but within the bounds of Civil Rule 11.[82] Defending a lawsuit fully yet fairly cannot constitute unconstitutional retaliation against the person who filed the suit. Golden, however, interpreted Boutin's comment more direly, as not just a prediction that the State would fully defend itself, but a threat to protract the litigation in bad faith so as to prevail by exhausting Brady's resources. While such conduct, or a threat thereof, could well be unconstitutional retaliation, it is an extreme reading of Boutin's comment to see it as such a threat.

Golden, however, witnessed Boutin's manner and tone; we did not. A factfinder surely could reject Golden's inference as unreasonable; indeed, we think it a close question whether Golden's affidavit is so conclusory as to deserve no weight at all for summary-judgment purposes.[83] But giving Brady, a *pro se* litigant facing summary judgment, every benefit of the doubt, we will assume that the affidavit is entitled to some weight, and that a reasonable factfinder would not be bound to reject Golden's inference. Brady's interpretation of Boutin's comment as a threat, however, is tenuous; it was at most a very equivocal, indirect threat. It was, moreover, neither carried out, nor effective in deterring Brady, nor made by the official who would direct the State's litigation. We acknowledge that federal courts have held that the fact that a threat is not carried out, or that it

---

81. Brady affied that two people who do not work for the State told him that officials had ordered State employees not to associate with him. He alleged that this pressured private forestry professionals not to associate with him. Saxby and Boutin executed affidavits flatly denying any such order. The conflicting affidavits, however, do not raise a genuine factual dispute, for Brady's affidavit rests only on hearsay—third- and fourth-party descriptions of State officials' alleged words. Hearsay is inadmissible to oppose summary judgment. *See, e.g., Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1218 (Alaska 1991).

82. *See* Alaska R. Civ. P. 11 (requiring parties to certify that all filings are "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and . . . not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless expense").

83. *See, e.g., West v. City of St. Paul*, 936 P.2d 136, 140 (Alaska 1997) ("Conclusory statements in opposing affidavits are not sufficient to defeat a summary judgment motion.").

does not deter a litigant, does not *prevent* it from supporting a cause of action for unconstitutional retaliation.[84] We conclude, however, that those factors can *contribute* to making a threat insufficient to support a cause of action, and that, in this case, given that Boutin's threat was at most equivocal and indirect, they make that threat *de minimis* as a matter of law. It is not significant enough to support a cause of action. It can at best provide supporting evidence of a retaliatory intent if some other alleged retaliatory act is sufficiently serious to support a claim.

 The remaining alleged act is applying AS 09.25.122 overbroadly so as to deny Brady access to all public forestry records. Given that Brady's suit very broadly challenged the State's management of south-central Alaskan forests, the breadth of public records to which officials denied Brady the usual public access could reflect a plausible, good-faith interpretation of what AS 09.25.122 directed. If, however, Boutin ordered or conspired with Saxby to order a broader denial of access than he in good faith believed that AS 09.25.122 required—and did so with a retaliatory intent to harass Brady or impair his livelihood—such conduct could well comprise unconstitutional retaliation.

We conclude, however, that Saxby's letter offering to permit Brady access to all public records, if Brady would commit in writing not to use such access to gather documents for litigation, rebuts any inference that officials were acting with retaliatory intent. Given Saxby's offer, Boutin did not unconditionally deny Brady access to public records, but merely denied him access until he promised not to use that access to gather evidence. Boutin and Saxby merely required him, in other words, to promise to respect the purpose of AS 09.25.122. Indeed, giving Brady access to all records regardless of their relevance to his suit, if he only promised not to misuse that access, would relax the literal requirements of AS 09.25.122. The statute refers to public records "used for, included in, or relevant to litigation ... involving a public agency" and directs in mandatory language that "with respect to a

person involved in litigation [with a public agency], the records sought shall be disclosed in accordance with the rules of procedure applicable in a court." A ban on the usual access to public records pending a promise not to misuse that access was a plausible, good-faith, commonsensically fair interpretation of AS 09.25.122 and cannot, as a matter of law, support a reasonable inference of retaliatory intent.

We thus affirm summary judgment as to Brady's unconstitutional-retaliation claim.

## IV. *CONCLUSION*

We AFFIRM the judgment in all respects.