Don E. WILSON; William G. Barber; Patricia W. Barber; Herb Baker; Jesse M. Black; James R. Raine; Gary L. Fabiano; T.J. Trogdon, III; Ray P. Dinsmore; Donald C. Carroll; Duane Gray; Castle Mountain Subdivision Architectural Control Committee by its members, Jesse M. Black, Harold B. Ross, and Gale Nash; and Castle Mountain Irrigation Road and Recreation Association, a non-profit Colorado corporation, Plaintiffs-Appellees-Cross-Appellants,

v.

William A. GOLDMAN, Defendant-Appellant-Cross-Appellee.

No. 83CA1325.

Colorado Court of Appeals, Div. II.

March 21, 1985.

Charles Alexander, Gunnison, William G. Barber, Pro Se/Pro Haec Vice, Austin, Tex., for plaintiffs-appellees-cross-appellants Wilson, William G. Barber, Patricia W. Barber, and Raine.

Ranous, Stern & Patrick, P.C., J. Steven Patrick, Gunnison, for plaintiffs-appellees-cross-appellants Baker, Black, Fabiano, Trogdon, Dinsmore, Carroll, Gray, Castle Mountain Subdivision Architectural Control Committee, Ross, Nash, and Castle Mountain Irr. Road and Recreation Assn.

Andrew J. Kasic, Gunnison, for defendant-appellant-cross-appellee.

VAN CISE, Judge.

Defendant, William Goldman, appeals from a judgment enforcing protective covenants, requiring him to remove a new fence and restore an old one, and denying his affirmative defenses and counterclaims relating to the fence construction. Plaintiffs cross-appeal from that portion of the judgment relating to their claim for attorney fees. We affirm in part, reverse in part, and remand the matter with directions.

The relevant facts are not in dispute. Castle Mountain Company Wilderness Streams Filing No. 2 (the subdivision) is a rural residential subdivision located in Gunnison County. It consists of approximately 400 acres in a mountainous region adjoining a national wilderness area and is divided into approximately 80 lots ranging in size from one to more than 12 acres. The "platted roads, ways and streets" and the "open space and public lands" in the subdivision are owned by Castle Mountain Irrigation, Road and Recreation Association (the Association) for the use and benefit of the owners of the lots in this and the other Castle Mountain Company (the Company) subdivisions.

Protective covenants applicable to the subdivision were recorded in 1972. These provide in pertinent part that the Association shall maintain the roads and water systems for the subdivision and that the costs for such services shall be assessed by it against the individual lot owners on a *pro rata* basis. No buildings or structures are to be maintained or constructed on any lot without the written approval of an Architectural Control Committee (the Committee). The Committee is given the authority to lease the common pastures in the subdivision "not within an approved fence or enclosure" to third parties for the purpose of grazing horses and cattle, with all income from such leasing activity to "be utilized for the improvement and maintenance of the pasture and open spaces." Lot own-

ers and their families are granted fishing rights on any streams within this and all other Company subdivisions. Further, under the covenants, the Company retained a 30-foot easement along each side of any fishing streams.

In 1979, defendant acquired seven contiguous lots inside the subdivision encompassing approximately 40 acres. In May 1981, without the written approval of the Committee, he constructed a fence around the perimeter of his property and removed part of an existing fence. Paragraph 21 of the covenants provides in pertinent part that:

> "No fences may be erected, constructed or maintained upon any lot unless ... [it] is a fence currently existing on the property, provided that holding corrals for horses and fences around dwellings and yards may be allowed upon the approval of the Committee."

Plaintiffs (the Association, the Committee, and various individual lot owners) commenced the present action against the defendant, seeking a mandatory injunction requiring him to remove the fence surrounding his 40 acres that he constructed and to replace the previously existing fence. Plaintiffs also sought damages for loss of leasing income and attorney fees.

In his answer, defendant alleged, *inter alia*, that the Committee, through one of its members, had orally approved the construction of the fence. He also relied on a provision in the covenants requiring the Committee to approve or disapprove the construction of a proposed structure within 30 days and providing that in the event the Committee fails to act within the prescribed 30-day period, the structure "shall be deemed to have been approved." In addition, he filed six counterclaims against the plaintiffs, seeking to have various covenants declared void and unenforceable. He also sought an accounting of all income derived from the leasing of the common pastures, damages for an alleged failure on the part of the Association to irrigate his property properly, and an injunction prohibiting the exercise of fishing rights by persons who did not own lots in the subdivision.

The matter was heard by the court. It determined that, by constructing a fence around the perimeter of his property, defendant had violated paragraph 21 of the covenants and that this was so regardless of whether the Committee approved the construction of the fence. Defendant was therefore ordered to remove the fence and to replace the previously existing fence.

With respect to defendant's counterclaims, the court determined that he was entitled to an accounting of the leasing income but that his remaining counterclaims against the Association and the Committee were without merit. A counterclaim against one of the individual plaintiffs was deferred for trial at a later date. The judgment appealed from was certified as final pursuant to C.R.C.P. 54(b).

## I. *Fencing*

Defendant first contends that paragraph 21 of the covenants was ambiguous and unenforceable because the word "yard" is not defined. In the alternative, he contends that the trial court erred in concluding that the Committee lacked the authority to approve the fence that he constructed. We disagree with both of these contentions.

In determining whether the provisions of a document are ambiguous, the language of the document must be construed in harmony with the plain, ordinary, and commonly accepted meaning of the words employed, and reference must be made to all provisions of the document. *Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.*, 195 Colo. 253, 577 P.2d 748 (1978). These rules of construction are applicable to protective covenants. *See Tri-State Generation & Transmission Co. v. City of Thornton*, 647 P.2d 670 (Colo.1982); *D.C. Burns Realty & Trust Co. v. Mack*, 168 Colo. 1, 450 P.2d 75 (1969).

Ordinarily, the term "yard," as used in the context under consideration here, refers to a relatively small area adjacent to or surrounding a dwelling and not

to a large tract of land encompassing many acres. Thus, when read in the context of paragraph 21 and the covenants as a whole, the term "yard" cannot reasonably be construed as referring to an area encompassing almost 40 acres. Further, we reject defendant's contention that paragraph 21 of the protective covenants is ambiguous simply because the term "yard" is not defined with mathematical precision.

■ We also reject defendant's contention that the Committee had the authority to approve the construction of the fence. Under paragraph 21 of the covenants, the Committee only had authority to approve "holding corrals ... and fences around dwellings or yards," and the construction of all other fences except those on an exterior lot line of the subdivision were expressly prohibited. Thus, the Committee lacked the authority to approve the construction of a fence around the perimeter of defendant's lots. *See Stratford v. Littlehorn,* 635 P.2d 910 (Colo.App.1981), *rev'd on other grounds, Littlehorn v. Stratford,* 653 P.2d 1139 (Colo.1982).

## II. *Leasing*

Defendant further contends that the trial court erred in not concluding that the provision of the protective covenants relating to the leasing of common pastures was void and unenforceable. Defendant argues that the leasing provisions conflict with the provision of the covenants restricting lot use to single family dwellings and the provision prohibiting nuisances. We disagree.

■ As noted previously, protective covenants must be construed as a whole and interpreted in view of their underlying purposes. *Tri-State Generation & Transmission Co. v. City of Thornton, supra.* Here, the obvious purpose of the leasing provisions was to generate income for the maintenance and improvement of the pastures and open spaces. Implicit in the Committee's leasing authority is that such authority be exercised in a reasonable manner and in good faith. *Cf. Rhue v. Cheyenne Homes, Inc.,* 168 Colo. 6, 449 P.2d 361 (1969). Suffice it to say here that, in light of the purpose of the leasing provisions and the implicit limitations on the Committee's authority, we perceive no conflict between such provisions and the covenants prohibiting nuisances and restricting lot use on the part of the owners to single family dwellings.

■ We also reject defendant's assertion that the leasing provisions were ambiguous because the number of cattle or livestock permitted to graze on the pastures and open spaces is not specified. The Committee's obligation to exercise its leasing authority in good faith and in a reasonable manner serves as an adequate limitation on the number of livestock permitted.

■ Defendant's contention that the leasing provisions were ambiguous because the pastures and fences referred to therein were not located or described on any recorded documents is also without merit. Obviously, the location of such pastures and fences could be ascertained with certainty from a physical inspection of the property itself.

## III. *Leasing Income*

Defendant next contends that the trial court erred in not requiring that all leasing income expended by the Association for road maintenance be repaid to the Committee for the purpose of improving and maintaining the common pastures and open spaces. Again we disagree.

Paragraph 20 of the covenants provides that income generated by leasing "shall be utilized for the improvement and maintenance of the pasture and open spaces." It was undisputed that part of the leasing revenues had been expended by the Association for road maintenance. However, it was also undisputed that the assessments to the individual lot owners for road maintenance were proportionately reduced by the amount of the leasing income expended for that purpose and that to require the Association to repay such sums to the Committee would necessitate a direct assessment against past and present lot owners. As the trial court noted:

"To adopt the defendant's recommendation requiring the Association to pay over to the Committee the sum of $27,-151.81 is clearly a 'robbing Peter to pay Paul' kind of situation, and would impose a financial burden on members of the Association, including Mr. Goldman, which is not equitable. The net effect of this procedure would be to specially assess the lot owners from 1976 through 1982 their *pro rata* share and end up with a large sum of money sitting in a special fund for which there is no use, at least as to such a large amount."

The trial court did order that, in the future, income from leasing activities be utilized only for the purposes authorized under paragraph 20.

 Generally, protective covenants that are clear on their face must be enforced as written. *D.C. Burns Realty & Trust Co. v. Mack, supra.* However, as we noted in *Rice v. Hilty,* 38 Colo.App. 338, 559 P.2d 725 (1976): "Equity may fashion a remedy to effect justice suitable to the circumstances of the case." *See also Dlug v. Wooldridge,* 189 Colo. 164, 538 P.2d 883 (1975). Given the circumstances presented here, we find no abuse of the trial court's discretion in refusing on equitable grounds to require the Association to repay to the Committee the sums expended on road maintenance. Although technically improper, the expenditures complained of benefited all of the individual lot owners, including defendant, and neither the subdivision as a whole nor any of the individual lot owners were damages thereby.

## IV. *Fishing Rights*

 Defendant next contends that the trial court erred in not concluding that only lot owners in the subdivision and their families were entitled to exercise fishing rights under paragraph 18 of the covenants. We disagree.

Paragraph 18 provides as follows:

"FISHING RIGHTS: It is understood that the Castle Mountain Company retains all fishing rights for the use of member property owners and their families on any stream, streams or waters within the boundaries of the company owned land. Each member property owner may have, not to exceed two (2) house guests engaged in fishing at any one time. The company also reserves a 30 foot easement and right of way along each side of fishing streams traversing said area as a fishing easement and for such other purposes as will not interfere with such fishing rights."

This paragraph does not, as defendant asserts, grant lot owners in the subdivision and their families the exclusive right to fish on "company owned lands," nor does it prohibit other members of the Association from exercising fishing rights within the subdivision. And from the totality of the evidence presented, it is clear that the Company's intention was to reserve fishing rights for all members of the Association, including lot owners in other subdivisions developed by the Company. Hence, we conclude that the trial court's interpretation of paragraph 18 was correct.

## V. *Attorney Fees*

In the plaintiffs' initial complaint, only the Association requested an award of attorney fees. In the amended complaint, the Committee also requested attorney fees. The trial court concluded that the Association was not entitled to attorney fees with respect to plaintiffs' claim for injunctive relief against defendant because, under paragraph 25 of the protective covenants, only individual lot owners and the Committee were authorized to bring legal proceedings to enforce the covenants. The court further concluded that with respect to plaintiffs' claim for injunctive relief, the Committee was entitled to recover only those attorney fees incurred after the amended complaint was filed. Both defendant and the plaintiffs challenge this ruling. By stipulation of the parties, the actual amount of the attorney fees presumably expended was deferred for resolution until after trial. Plaintiffs also seek recovery of the fees incurred in connection with this appeal.

Defendant contends that the Committee was not entitled to any attorney fees because testimony at trial established that all of the attorney fees incurred by the plaintiffs were paid for by the Association. Plaintiffs contend that the trial court erred in concluding that the Committee was entitled to recover only those attorney fees incurred after the amended complaint was filed.

Paragraph 25 of the protective covenants provides as follows:

> "ENFORCEMENT: If any person shall violate or threaten to violate any of the provisions of this instrument, it shall be lawful for any person or persons owning a lot in the subdivision, or the committee to institute proceedings at law or in equity to enforce the provisions of this instrument, and to recover damages, actual and punitive, together with reasonable attorneys' fees, for such violation."

The record discloses that even though the Association paid for the attorney fees incurred by the plaintiffs in the present litigation, the Association's income was derived from assessments made to individual lot owners and from the leasing activities referred to in Parts II and III of this opinion. Thus, the ultimate costs of the litigation, including the attorney fees, were borne ultimately by the individual lot owners.

■■■ Given these circumstances, it would be manifestly inequitable not to permit the plaintiffs to recover attorney fees simply because such fees were paid by the Association rather than the Committee. Equity looks at the substance and reality of a transaction and not at its form. *Rocky Mountain Gold Mines, Inc. v. Gold, Silver & Tungsten, Inc.*, 104 Colo. 478, 93 P.2d 973 (1939).

■■■ We also conclude that the trial court erred in limiting the Committee's recovery of attorney fees on plaintiffs' claim for injunctive relief to those incurred after the amended complaint was filed. Under C.R.C.P. 15(c), the amendment of the complaint requesting attorney fees on behalf of the Committee relates back to the date of the filing of the initial complaint. We perceive no justification for limiting an award of attorney fees to those incurred after the amended complaint was filed.

Based on the foregoing, we further conclude that plaintiffs are entitled to recover the attorney fees reasonably incurred in connection with this appeal, regardless of whether such fees were paid for by the Association or some other entity on plaintiffs' behalf.

That portion of the judgment relating to attorney fees is reversed, and the cause is remanded for further proceedings consistent with the views expressed herein. The remainder of the judgment is affirmed.

BERMAN and STERNBERG, JJ., concur.