24CA1033 Petruccelli v JRF River 09-18-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1033
Ouray County District Court No. 21CV30018
Honorable D. Cory Jackson, Judge

John T. Petruccelli,

Plaintiff-Appellee,

v.

JRF River Ranch LLC, a Colorado limited liability company, and Andrew McGlone,

Defendants-Appellants.

APPEAL DISMISSED IN PART, JUDGMENT AFFIRMED IN PART
AND REVERSED IN PART, AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE BROWN
Dunn and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 18, 2025

Karp Neu Hanlon, P.C., James F. Fosnaught, Aaron T. Berne, Rachel A. Sigman, Glenwood Springs, Colorado, for Plaintiff-Appellee

Brian Kidnay, P.C., Brian Kidnay, Montrose, Colorado, for Defendants-Appellants

¶ 1     Defendants, JRF River Ranch LLC (JRF) and Andrew McGlone, appeal the district court's judgment in favor of plaintiff, John T. Petruccelli. We dismiss part of the appeal, affirm the judgment in part and reverse it in part, and remand the case for the court to correct the judgment on two claims and to determine appellate attorney fees and costs.

## I.     Background

¶ 2     Before 1997, Petruccelli and his business partner, Robert Hagert, jointly owned property in Ridgway, Colorado. In 1997, Petruccelli and Hagert subdivided the property into Parcel A (owned by Hagert) and Parcel B (owned by Petruccelli first through River Ranch I LLC and then individually).[1] The plat subdividing the two properties established a twenty-five-foot-wide access and utility easement on Parcel A benefiting Parcel B.

---

[1] The district court found that Petruccelli and Hagert jointly owned the property before it was subdivided into Parcel A and Parcel B. JRF disputes that finding — asserting instead that Hagert alone owned the undivided property — but admits this fact "is not material." It is also unclear based on the record before us when ownership of Parcel B transferred from River Ranch I LLC to Petruccelli individually, but this fact too seems inconsequential. Any reference we make to Petruccelli includes River Ranch I LLC, where appropriate.

¶ 3　　After the property was subdivided, Hagert developed Parcel A into a "Tiny Town" at which public events requiring ample parking would take place. For his part, Petruccelli built a commercial and residential building (the Alpine Building) on Parcel B. Tenants and patrons of the Alpine Building would park on the south side of the building. But because of a retaining wall, cars could not access the parking spaces on the south side of the Alpine Building from the access easement without crossing Parcel A. The access easement created as part of the subdivision lies to the west of Parcel B's property line. A recent survey of Parcel B reflects this layout:



Survey of Parcel B

¶ 4     In 2002, to address their respective parking needs, Petruccelli and Hagert entered into an agreement to "share access and parking on each other's property." According to the agreement, the parties "understood that [Petruccelli] has overflow parking privileges based upon need and subsequentially [sic] [Hagert] has the right to overflow parking privileges on [Petruccelli's property] based on need." The 2002 agreement was not recorded.

¶ 5     Over the ensuing years, disputes arose between Petruccelli and Hagert, including over whether the 2002 agreement permitted a school bus and recreational vehicles to park on Parcel A. In 2006, the disputes culminated in Petruccelli suing Hagert. As part of the settlement of that lawsuit, Petruccelli and Hagert entered into another Shared Parking Agreement (the SPA), which was recorded in the Ouray County property records and is the subject of this litigation.

¶ 6     Under the SPA, "Hagert grant[ed] to [Petruccelli], and [Petruccelli] grant[ed] to Hagert, an access and parking easement which shall be perpetual and the burden and benefit of which shall run with the Hagert [p]roperty and the [Petruccelli] [p]roperty." The

3

relevant terms of "the mutual access and parking easement" are as follows:

>a.  The easement shall be on and over the area of the Hagert [p]roperty and the [Petruccelli] [p]roperty described and depicted on Exhibit C. Each party shall make available for overflow parking twelve (12) parking spaces.
>
>b.  [Petruccelli] and Hagert shall have the right to park in parking spaces located on their own property.  The [p]arties, their guests, invitees and tenants must first utilize the parking spaces on their own property, prior to utilizing parking on [the] other party's property.
>
>c.  [Petruccelli] and Hagert shall have [the] right to utilize each other's property for vehicular and pedestrian access and parking as set forth herein.  On the [Petruccelli] [p]roperty this shall include the twelve (12) spaces located on the south side of [the Petruccelli] property.  On the Hagert [p]roperty it shall include the twelve (12) parking spaces identified on Exhibit C, south of Alpine Building.
>
>d.  In addition, Hagert shall, on or before June 15, 2009, remove the structure, construction materials and inoperable vehicles located in the Mutual Impact Area [MIA] (see Exhibit C).
>
>e.  Hagert and [Petruccelli] shall have the right to further develop their respective property with additional improvements.  If either party does in fact develop improvements which interfere with or overlap the mutually available parking spaces, the developing party shall have the right to relocate the parking spaces to

4

an area on the developing party's property.  In this instance, the developing party shall provide substitute parking spaces of the same size and in the same number and in a location which does not make the spaces substantially more difficult to use by the non developing party.  Any development pursued by either party in the [MIA] must comply with Town of Ridgway applicable building, zoning and subdivision regulations.

f.  The parties agree to jointly maintain the vehicular access and parking area.  The costs of the maintenance will be divided equally between the parties.

g.  Any party desiring to improve[] (i.e.[,] pave or install underground drainage) on any portion of the access and parking area designated on Exhibit C shall be entitled to do so at their own expense, so long as such party obtains appropriate approvals from governmental entities involved, and the approval from the other party, which approval shall not be unreasonably withheld.

h.  There shall be no storage of campers, trailers, or inoperable vehicles in the area designated on Exhibit C as the [MIA].  There shall be no parking of any vehicle longer than [twenty] days in the designated parking areas.

¶ 7     The following diagram is Exhibit C to the SPA[2]:

---

[2] On the diagram, R.R.I. L.L.C. refers to River Ranch I, LLC, Petrucelli's company.



Exhibit C to the SPA

¶ 8   In 2019, JRF purchased Parcel A from Hagert.  Justin Fagan is JRF's sole member and principal, and Andrew McGlone is JRF's property manager.

¶ 9     Beginning in December 2021, McGlone began parking "older and unique" vehicles that were not regularly driven in the twelve JRF shared spaces designated on Exhibit C of the SPA. At times, the parked cars would block a historic path of travel through the MIA, which ran south and around to the east of a split rail fence situated immediately south of the JRF shared spaces.



Aerial Image of Parked Vehicles in JRF Shared Spaces

At other times, McGlone entirely blocked Petruccelli's access to the shared parking spaces on both parcels by parking cars end to end or placing boulders and construction equipment at the access points.



Aerial Image of Vehicles Parked End to End

¶ 10    In 2022, Petruccelli filed this action, asserting claims against JRF for breach of contract, breach of the duty of good faith and fair dealing, and declaratory judgment, and claims against both JRF and McGlone for trespass and nuisance.[3]  Petruccelli also sought injunctive relief to prevent JRF and McGlone from obstructing his access to the shared parking spaces.  JRF asserted counterclaims against Petruccelli for breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, continuing trespass, trespass, nuisance, civil theft, and declaratory judgment.

¶ 11    Following a three-day bench trial, the district court issued a thorough written order.  It entered judgment in favor of Petruccelli on his claims for breach of contract, breach of the implied duty of good faith and fair dealing, trespass, and nuisance.  The court awarded Petruccelli $45,496 in damages on the breach of contract claim and nominal damages on the other claims.  The court declined to enter the permanent injunction Petruccelli had requested.  And it made just two declarations, one in favor of

---

[3] Petruccelli also asserted a claim for civil conspiracy against JRF and McGlone, but the district court dismissed that claim before trial.

9

Petruccelli and one in favor of JRF and McGlone. The court also entered judgment in favor of JRF on its claims for trespass and continuing trespass. It awarded JRF nominal damages for the trespass and $1,800 in damages and mandatory injunctive relief — requiring Petruccelli to relocate portions of the retaining wall that encroached on Parcel A — for the continuing trespass. The court rejected the balance of JRF's counterclaims.

## II.     Analysis

¶ 12     JRF contends that the district court erred by (1) misinterpreting the SPA solely as an easement rather than as a restrictive covenant; (2) miscalculating the damages awarded to Petruccelli on his breach of contract claim; (3) awarding damages for breach of contract against JRF and McGlone jointly and severally; and (4) determining that Petruccelli was the prevailing party for purposes of awarding attorney fees and costs.

¶ 13     We perceive no error in how the district court interpreted the SPA or calculated the damages resulting from JRF's breach. But we conclude that the court erred by entering judgment on the contract-based claims against McGlone jointly and severally with JRF, so we reverse that part of the judgment and remand for the

10

court to correct it. Finally, we dismiss the part of JRF's appeal challenging the court's determination that Petruccelli was the prevailing party for lack of a final, appealable order.

## A. Interpretation of the SPA

¶ 14 As best we understand, JRF contends that the district court erred by interpreting the SPA as creating an access and parking easement over the entirety of the MIA instead of interpreting the SPA as creating an access and parking easement over a small segment of the property and a restrictive covenant throughout the rest of the MIA. We disagree.

### 1. Standard of Review and Applicable Law

¶ 15 "[T]he conveyance of easements through instruments is rooted in contract law." *Ute Water Conservancy Dist. v. Fontanari*, 2022 COA 125M, ¶ 35 (alteration in original) (quoting *McMahon v. Hines*, 697 N.E.2d 1199, 1205 (Ill. App. Ct. 1998)). Interpreting a written contract is a question of law. *Id.* We review the court's legal conclusions de novo. *Kroesen v. Shenandoah Homeowners Ass'n*, 2020 COA 31, ¶ 55.

¶ 16 Even if we find an error, we will not disturb a judgment on appeal unless the error affects the substantial rights of the parties.

11

C.R.C.P. 61; *Bernache v. Brown*, 2020 COA 106, ¶ 26.  An error affects a party's substantial rights if it substantially influences the outcome of the case or impairs the basic fairness of the trial itself. *Bernache*, ¶ 26.  The party asserting the error on appeal has the burden of showing that it was not harmless.  *Curry v. Brewer*, 2025 COA 28, ¶ 54.

¶ 17    "An easement is a right conferred by grant, prescription or necessity authorizing one to do or maintain something on the land of another . . . ."  *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1234 (Colo. 1998).  The property burdened by an easement is the "servient estate" and the property benefited by the easement is the "dominant estate."  *Id.*  Because an easement does not convey title to the land over which it is exercised, the owner of the servient estate "enjoys all the rights and benefits of proprietorship consistent with the burden of the easement; while the rights of the owner of the dominant estate are limited to those connected with use of the easement."  *Id.*

¶ 18    "The extent of an expressly created easement (i.e., the limits of the privileges of use authorized by the easement) is determined by interpreting the conveyance instrument."  *Id.* at 1235.  In

12

interpreting such an agreement, "[o]ur paramount concern . . . is to ascertain the intentions of the parties." *Id.* A court must first attempt to ascertain the parties' intent from the words used in the instrument granting the easement and the circumstances surrounding the grant. *Id.* at 1236. In doing so, a court may refer to extrinsic evidence to determine whether the terms of the agreement accurately reflect the parties' intentions or if they are ambiguous. *Id.*

¶ 19 If the terms of the agreement and any relevant extrinsic evidence reveal that "the language of the [agreement] accurately and unambiguously reflects the intentions of the parties, the court should disregard the extrinsic evidence for future purposes, and give effect to the language of the [agreement]." *Id.* If the court determines that the language of the agreement is ambiguous, however, it may rely on the extrinsic evidence to ascertain the intent of the parties. *Id.* at 1236-37.

¶ 20 Although a court may refer to extrinsic evidence to determine the meaning of the instrument granting the easement, such evidence may not be used to contradict the language in the written instrument. *Id.* In all cases, the "written instrument . . . assumes

13

great importance as the primary source of information to prospective purchasers of the land," *id.* at 1237, and "'should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved.'" *Id.* (quoting Restatement (Third) of Prop. § 4.1 cmt. c (A.L.I., Tentative Draft No. 4, 1994)).

### 2. Additional Background

¶ 21 In resolving the parties' competing claims, the district court interpreted the SPA in the following relevant ways:

- "The SPA creates an 'access and parking easement' over the area depicted in Exhibit C to the SPA called the [MIA]." "This MIA is not limited to [the] area north of the split rail fence, and plainly extends to the east of it." JRF's argument "that access to parking spaces should be limited to [a] twenty-two[-]foot access easement" between the two rows of shared spaces is "an unreasonable interpretation that renders the existence of the MIA beyond that twenty-two[-]foot easement meaningless."

- By parking "cars [end to end] blocking all access" to the twelve shared parking spaces on each parcel, JRF

14

"violated the provision of the SPA giving each party the 'right to utilize each other's property for vehicular and pedestrian access and parking.'"

- With respect to JRF parking vehicles at the east end of the twelve JRF shared spaces in a manner that obstructed the historic flow of traffic around the split rail fence, "Petruccelli's argument that the MIA must never be obstructed is overbroad because it would make the development language elsewhere in the SPA meaningless. For these reasons, the SPA should be interpreted to allow full use of the twelve JRF spaces in a manner that restricts the flow of traffic around the split rail fence to the east."

- "JRF may move the [twelve] overflow parking spaces on its property" to accommodate further development of Parcel A but "has an obligation to provide substitute parking that is not substantially more difficult to use than the existing parking, and also cannot interfere with the access and parking easement to the extent that it must continue to exist to provide access to the remaining

15

parking spaces on Parcel B." But because "JRF's development proposal is not clearly established — it appears to have been developed for purpose[s] of this litigation" — issuing a declaratory judgment that the development would or would not violate the SPA would be an inappropriate "advisory opinion."

### 3. The District Court Correctly Determined that the SPA Creates an Access and Parking Easement over the MIA

¶ 22 JRF contends that the district court erred by failing to conclude that the SPA grants "a parking and access easement for both parties *and* a restrictive covenant within the MIA preventing the storage of campers, trailers[,] and inoperable motor vehicles." (Emphasis added.) JRF specifically argues that the court erroneously concluded that the entire MIA was an access and parking easement "with no interpretation or analysis of the SPA's language" and that the only "access" granted to the "overflow parking spaces is the [twenty-two-foot] easement designated on Exhibit C."

¶ 23 According to JRF, because "the easement rights and the MIA are referenced in separate provisions of the SPA," the parties'

16

"intent in creating the MIA was to create a distinct and separate provision from the [twenty-two-foot] easement to the overflow parking spaces that was also created in the SPA."  JRF argues that the MIA "does not provide the right to use another's property" for a specific purpose, but instead "*limits* the uses of both properties by preventing the storage of campers, trailers[,] or inoperable vehicles" and, consequently, "is a covenant/negative servitude and not an easement/positive servitude."  Finally, it argues that the court's interpretation "renders the MIA meaningless, as it is synonymous with the access and parking easement to the overflow parking spaces."  For three reasons, we are not persuaded by JRF's arguments.

¶ 24     First, no provision of the SPA limits the "easement" to the twenty-two feet between the two rows of shared parking spaces, as JRF argues.  Although Exhibit C to the SPA notes that the distance between the two rows of shared parking spaces is twenty-two feet, it does not identify that area as the easement or distinguish it in any way from the balance of the MIA.  Instead, the SPA plainly provides that the easement is "on and over the area . . . described and depicted on Exhibit C."  Aside from the shared parking spaces

17

themselves, the only area described and depicted on Exhibit C is the "mutual impact" area. Thus, we agree with the district court that the SPA creates "a mutual access and parking easement" over the area identified on Exhibit C as the MIA. *See Lazy Dog Ranch*, 965 P.2d at 1235 ("The extent of an expressly created easement . . . is determined by interpreting the conveyance instrument.").

¶ 25 Second, we disagree that the "easement" and the "MIA" are "referenced in separate provisions of the SPA," demonstrating the parties' intent to treat them as two separate zones in which the parties have different rights and obligations. Paragraph six of the SPA sets out the "terms and conditions of the mutual access and parking easement" and includes all three subparagraphs that specifically mention the MIA. This structure makes clear that all provisions addressing the MIA are "terms and conditions" of the easement rather than rights and obligations to be considered distinct from the easement. That the parties expressly agreed to limit what could be stored in the MIA (e.g., "construction materials," "campers, trailers, [and] inoperable vehicles") and how the MIA could be developed in the future (e.g., parking spaces can be

relocated so long as the spaces are not "substantially more difficult to use") does not undermine their mutual grant of access and parking rights in that same area. *See id.*

¶ 26  Third, to the extent that JRF argues that the district court should have interpreted the MIA as a restrictive covenant rather than as an easement, that argument appears to be premised on our agreeing with JRF that the easement covers only the twenty-two feet between the two rows of shared parking spaces. But we have already rejected that premise. Beyond that, JRF argues only that interpreting the SPA as establishing a parking and access easement coextensive with the MIA "will create inevitable conflict, as the servient estate can make any use of an access easement that the dominant estate does not need," while a "[f]inding [that] the MIA is a covenant, . . . completely and consistently resolves this property dispute."

¶ 27  JRF is correct that, as the owner of the servient estate, it can use the MIA in any way that does not interfere with Petruccelli's rights to access and parking. That is true of any easement. *Id.* at 1238 ("Unless the intentions of the parties are determined to require a different result, the owner of the servient estate may make

19

any use of the burdened property that does not unreasonably interfere with the enjoyment of the easement by its owner for its intended purpose.").  There is nothing unique about the easement granted by the SPA that would lead to "inevitable conflict."

¶ 28    Even so, JRF does not explain how interpreting the MIA as a restrictive covenant would "completely and consistently resolve the dispute."  Like easements, restrictive covenants are interpreted according to their plain language and enforced as written.  *See Pulte Home Corp. v. Countryside Cmty. Ass'n*, 2016 CO 64, ¶ 23.  And parties can breach restrictive covenants just as they can easements.  *See, e.g., Wilson v. Goldman*, 699 P.2d 420, 422 (Colo. App. 1985) (affirming judgment enforcing restrictive covenants through injunctive relief).  JRF fails to explain why the distinction it seeks to draw matters or how the court's interpretation substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.  *Bernache,* ¶ 26 ; *see Curry,* ¶ 54.

¶ 29    JRF also argues that the district court failed to consider extrinsic evidence supporting its interpretation of the SPA.  But the court only needed to consider extrinsic evidence if it determined that the agreement was ambiguous.  *See Lazy Dog Ranch,* 965 P.2d

20

at 1236-37. And the court did not identify any ambiguity in the SPA with respect to the easement coexisting with the MIA (nor do we).[4] Moreover, to the extent the extrinsic evidence JRF offered contradicts the plain language of the SPA — which, as we have noted, does not limit the easement to the twenty-two feet between the two rows of shared parking spaces — the court appropriately declined to consider it. *See id.*

¶ 30 Finally, JRF contends that the court's declaration that Petruccelli is allowed to block part of the MIA on the west side of the Alpine Building is inconsistent with its interpretation of the SPA as creating an access and parking easement throughout the MIA. We are not persuaded.

¶ 31 Petruccelli installed permanent planters on the west side of the Alpine Building that prevented any vehicles from driving through or parking in that area, apparently to mitigate JRF's complaints that patrons of the building were parking in that area

---

[4] The only ambiguity the district court appears to have identified concerned whether JRF could park in the easternmost shared parking spaces if doing so blocked a historic path of travel. The court reasoned that "JRF and Petruccelli each have reasonable interpretations" of the SPA on that issue. The court considered extrinsic evidence and ultimately resolved that issue in JRF's favor.

21

and their vehicles were extending beyond the MIA into the pre-existing access easement situated exclusively on Parcel A. In addressing Petruccelli's request for a declaration that such mitigation measures were reasonable, the court explained that JRF's objection to those measures "was not clearly articulated at trial." It continued: "There does not appear to be any real dispute that Petruccelli may limit parking (on Parcel B) on the west side of the building if he chooses to do so. The planters and signs appear to be placed wholly on Parcel B as well."

¶ 32    On appeal, JRF does not explain why the district court's reasoning is faulty. Given that Petruccelli is entitled to make any use of Parcel B that does not interfere with JRF's rights to access and parking under the SPA, *see Lazy Dog Ranch*, 965 P.2d at 1238, JRF must explain how Petruccelli's installation of planters on the west side of the Alpine Building impacts JRF's ability to access or park in the shared parking spaces on Parcel B. It has not done so.

¶ 33    In the end, we agree with the district court that the SPA grants a "mutual access and parking easement" over the area identified on Exhibit C as the MIA.

22

## B. Damages for Breach of the SPA

¶ 34   JRF contends that the district court erred by miscalculating the damages awarded to Petruccelli as a result of JRF's breach of the SPA. Because the court's damages calculation has record support, we will not disturb it.

### 1. Standard of Review and Applicable Law

¶ 35   "The trial court, as factfinder, has broad discretion in determining the amount of damages" to be awarded. *McDonald's Corp. v. Brentwood Ctr., Ltd.*, 942 P.2d 1308, 1311 (Colo. App. 1997). An award of damages "may not be disturbed [on appeal] unless it is completely without support in the record." *Hauser v. Rose Health Care Sys.*, 857 P.2d 524, 531 (Colo. App. 1993). The amount of damages claimed may be an approximation so long as the fact that damages exist is certain and the party requesting the award "introduces some evidence which is sufficient to permit a reasonable estimation of damages." *Id.*

### 2. Additional Background

¶ 36   The SPA provides that "[a]ny party desiring to improve . . . on any portion of the access and parking area designated on Exhibit C

shall be entitled to do so . . . so long as such party obtains . . . approval from the other party."

¶ 37 In April 2023, JRF undertook a regrading project aimed at improving the access easement without first seeking approval from Petruccelli. Two experts testified that the work performed on the access easement was not performed in accordance with industry standards and would need to be repaired. One expert estimated that the cost to repair the work would be approximately $45,496. The court found that "[t]he quality of the work or the need for repair, as described by [the two experts], does not appear to be in dispute. The record is a bit unclear, but it does not appear that the cost is in dispute either. Petruccelli has established this cost by a preponderance." The court awarded Petruccelli $45,496 in damages.

3. The District Court's Damages Calculation Has Record Support

¶ 38 JRF does not challenge the court's finding that it breached the SPA by undertaking the regrading work; instead, it argues that the court miscalculated the associated damages because the expert's cost estimate was based on an erroneous understanding of the access easement's dimensions. JRF asserts that the expert used

dimensions of 50 feet wide by 150 feet long to calculate the repair estimate but that the access easement is only 25 feet wide by 86 feet long.[5]

¶ 39 Even so, JRF concedes that evidence introduced at trial supports the court's finding. Indeed, in arguing that the finding lacks evidentiary support, JRF points us to the exact place in the record where evidence supporting the finding exists. The expert testified that his repair cost estimate was not based on the surveyed easement dimensions but based on measurements he took of the area "that clearly needed [to be] fixed." The court found the expert credible. *In re Marriage of Fabos*, 2019 COA 80, ¶ 46 ("[D]etermining credibility is the district court's prerogative."). Because the court's award of damages for JRF's breach of the SPA is supported by credible record evidence, we will not disturb it. *Kroesen*, ¶ 55.

## C. Joint and Several Liability

¶ 40 JRF and McGlone contend that the district court erred by sua sponte entering judgment jointly and severally against JRF and

---

[5] In its written closing argument filed with the district court, JRF asserted that the easement was 25 feet wide by 130 feet long.

McGlone on Petruccelli's claims for breach of contract and breach of the duty of good faith and fair dealing.  Specifically, they argue that McGlone was merely JRF's agent and cannot be held liable for his disclosed principal's breach of contract.  We agree.

¶ 41   "Generally, a contract can be enforced only against a party to that contract."  *Barbara's Lighting Ctr., Inc. v. Churchill*, 540 P.2d 1110, 1111 (Colo. App. 1975); *accord Broderick v. McElron & McCoy, Inc.*, 961 P.2d 504, 506 (Colo. App. 1997) ("[P]rovisions of a contract cannot be enforced against those who are not parties to the contract.").  "There may be any number of parties to a contract, and multiple promisors may each promise a separate performance." *Magnuson v. Smith & Saetveit, P.C.*, 722 P.2d 1020, 1023 (Colo. App. 1986).  The intent of the parties as established primarily from the language of the contract itself "determines whether joint, several, or joint and several promises were made."  *Id.*

¶ 42   The only parties to the SPA are JRF (as successor in interest to Hagert) and Petruccelli (as successor in interest to River Ranch I LLC).  Because McGlone is not a party to the SPA, he cannot have made a "joint and several" promise with JRF as part of that

document. Thus, McGlone cannot be held jointly and severally liable for JRF's breach of its obligations. *See id.*

¶ 43    Notably, Petruccelli did not assert his contract-based claims against McGlone. Given how Petruccelli framed his complaint, the undisputed facts regarding who the parties are to the SPA, and the court's detailed findings concerning JRF and McGlone's principal-agent relationship, there is no legal basis for holding McGlone liable for breach of the SPA or for breach of the duty of good faith and fair dealing implied in the SPA — either individually or jointly and severally. *See Barbara's Lighting Ctr.*, 540 P.2d at 1111. Thus, we reverse the part of the judgment that awards damages for Petruccelli's contract-based claims against McGlone. We remand the case to the district court to enter judgment on those claims against JRF only.[6]

---

[6] The district court also entered judgment jointly and severally against JRF and McGlone on Petruccelli's claims of trespass and nuisance. JRF and McGlone do not challenge their joint and several liability on those tort claims, for which McGlone was a named defendant.

## D. Prevailing Party Attorney Fees Determination

¶ 44    The SPA includes a prevailing party attorney fees provision: "In the event that a dispute arises out of this Agreement, the prevailing party's reasonable attorney fees and costs shall be paid by the non-prevailing party."  Although each party prevailed to some extent on its respective claims, the district court determined that Petruccelli was the prevailing party entitled to attorney fees under the SPA.  JRF challenges that determination.  We dismiss this part of JRF's appeal without prejudice.  *See People v. S.X.G.*, 2012 CO 5, ¶ 9 ("Because we must always satisfy ourselves that we have jurisdiction to hear an appeal, we may raise jurisdictional defects sua sponte, regardless of whether the parties have raised the issue.").

¶ 45    Until the court determines the amount of attorney fees to award Petruccelli, its order determining which party prevailed for purposes of an attorney fee award is not a final, appealable order. *See Axtell v. Park Sch. Dist. R-3*, 962 P.2d 319, 322 (Colo. App. 1998); *accord In re Marriage of Humphries*, 2024 COA 92M, ¶¶ 47-49 (dismissing for lack of jurisdiction part of an appeal challenging the district court's order that one party was obligated to

28

pay the other party's attorney fees pursuant to statute because the court had not set the amount of fees to be awarded); *USIC Locating Servs. LLC v. Project Res. Grp., Inc.*, 2023 COA 33, ¶ 34 (same); *see also Stone Grp. Holdings LLC v. Ellison*, 2024 COA 10, ¶¶ 30-34 (concluding that the district court's summary judgment determination that one party was entitled to attorney fees under a fee-shifting provision of a contract became final when the court reduced the attorney fee award to a sum certain, even though a final judgment on the merits had entered earlier).  Requiring a court to set the amount of attorney fees before any order establishing liability for such fees becomes final "is also supported by considerations of judicial economy" because it "prevents piecemeal appeals." *M Life Ins. Co. v. Sapers & Wallack Ins. Agency, Inc.*, 40 P.3d 6, 15 (Colo. App. 2001) (dismissing part of an appeal challenging an order requiring one party to pay attorney fees pursuant to statute because the amount of such fees had not been determined, even though the fee liability order was "intertwined with the judgment on the merits"), *overruled on other grounds by, Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353 (Colo. 2003).

¶ 46    When JRF commenced this appeal, the district court had not yet entered an order setting the amount of attorney fees awarded to Petruccelli.  Although the court has since entered such an order, JRF did not move to amend its notice of appeal to include that order in this appeal.  Instead, JRF filed a second notice of appeal in Court of Appeals Case No. 25CA0530, seeking review of the court's order awarding attorney fees and costs to Petruccelli and contending that the court "did not correctly determine who was the prevailing party."  Thus, the prevailing party issue is not properly before us.  *See M Life Ins. Co.*, 40 P.3d at 15 (noting that the parties had filed a second appeal concerning attorney fees and advising that "[t]he parties may wish to include the issue of entitlement to such fees and expenses in that appeal").  As a result, we dismiss without prejudice the part of JRF's appeal challenging the district court's determination that Petruccelli was the prevailing party entitled to attorney fees under the SPA.

### E.    Appellate Attorney Fees and Costs

¶ 47    Both JRF and Petruccelli have requested appellate attorney fees under the prevailing party provision in the SPA.  Because Petruccelli has prevailed in this appeal, we grant his request as it

30

applies to JRF but deny his request as to McGlone. We also deny JRF's request. We exercise our discretion under C.A.R. 39.1 to remand the case to the district court to determine Petruccelli's reasonable attorney fees and costs incurred on appeal.

### III.  Disposition

¶ 48     We dismiss without prejudice the part of JRF's appeal that challenges the district court's prevailing party determination with respect to attorney fees. We reverse the court's entry of judgment jointly and severally against JRF and McGlone on Petruccelli's claims for breach of contract and breach of the duty of good faith and fair dealing and remand for the court to enter judgment on those claims solely against JRF. In all other respects, we affirm the judgment. We also grant Petruccelli's request for appellate attorney fees and costs as against JRF and remand for the court to determine the amount of fees and costs to be awarded.

JUDGE DUNN and JUDGE SCHOCK concur.